THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WATERS, Defendant-Appellant.

First District (6th Division)    No. 1—99—3457

Opinion filed February 15, 2002.—Rehearing denied March 18, 2002.

Rita A. Fry, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, Alan J. Spellberg, and Bradley C. Giglio, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Following a jury trial, defendant Michael Waters was convicted of aggravated criminal sexual assault and armed robbery and sentenced to consecutive terms of 10 and 6 years in prison, respectively. On appeal, defendant contends that (1) the trial court erred in denying his motion to vacate judgment or grant a new trial based on newly discovered evidence; (2) the State violated the rules of discovery by failing to inform the defense of a crucial change in the victim's testimony; (3) his consecutive sentence is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); (4) his consecutive sentence is improper because there was a substantial change in the criminal objective between the occurrence of the armed robbery and the aggravated criminal sexual assault; and (5) the jury was read an instruction that misstates the law.

## BACKGROUND

Defendant's conviction arose from an assault upon the 22-year-old

victim, N.B., on April 20, 1996, in Chicago. At trial, N.B. testified that around 11 p.m. on the night in question, she had an argument with her boyfriend and decided to drive around the block to a nearby park to "cool off." However, N.B. was upset, made a wrong turn, and soon got lost. N.B. testified that she drove around for about 15 minutes in an attempt to find a busy street. Ultimately, she came to the corner of 67th Street and Damen Avenue. While she was stopped at the light, N.B. noticed four men standing on the corner to her right, drinking beer. N.B. looked away because she did not want to draw attention to herself, but one man walked around the front of the car and suddenly "they were all opening the doors to get into the car." The man in the front seat, later identified as codefendant Wesley Montgomery, ordered, "Drive, bitch, drive." As N.B. drove, Montgomery directed her in and out of alleys, grabbed N.B.'s purse, took out about $4 in food stamps and $2 in cash, and passed it back to the three men in the backseat.

Eventually, the men ordered N.B. to stop the car in a deserted alley illuminated by a streetlight. N.B. testified that as soon as she turned off the car, the men in the backseat got out of the car. The man who had earlier walked around the front of the car positioned himself right next to the driver's side window. N.B. testified that this man, whom she later identified as defendant, appeared to be the oldest of the group and "looked like he was a leader of all of them." N.B. got a look at defendant's face because he took his hat off when he got out of the car, he was "right in the light," he was facing her, and nothing blocked her view. N.B. testified that she looked at defendant for about 15 or 20 seconds because she wanted to catch the details of his face.

N.B. testified that Montgomery, who was still in the front passenger seat, took out a "palm length" knife with a curved blade and two little points. In court, N.B. identified the knife as People's exhibit No. 13. N.B. testified that Montgomery pointed the knife at her abdomen and started fondling her breasts, trying to get into her pants. Montgomery said, "We are going to get you, bitch." Defendant told Montgomery, "Hurry up, dog. Do what you are going to do. Hurry up." N.B. was resisting and crying loudly, and defendant told her, "Don't scream, bitch, don't scream." At this point, N.B. lied to Montgomery, telling him that she had gonorrhea. Montgomery replied, "No you don't. Let me see. Let me see." He then tried to pull N.B.'s pants off, but N.B. kept pulling them up. Eventually, Montgomery pulled her pants open, penetrated her vagina with his finger for about 30 seconds, and said, "Doesn't feel like you got anything. It doesn't smell like you have anything." However, when he pulled his finger out, there was a little bit of blood on it and he said, "Oh, this bitch is poison. This bitch is sick or dirty," and wiped his finger on the seat.

N.B. testified that she reiterated to Montgomery that she had gonorrhea and told him to look in the glove compartment, where she had antibiotics for an unrelated infection. When Montgomery opened the glove compartment and saw the drugs, he told defendant, "This bitch is dirty."

N.B. testified that in response to Montgomery's statement, defendant picked up a baseball bat from the backseat of the car, swung it, and shattered the driver's side rear window. He said, "Fuck this bitch. Fuck this Mexican bitch." Defendant then punched N.B. in her left eye, causing her to bleed. Defendant told N.B. to clean herself up. While she was doing so, N.B. felt something warm on her shoulder. She turned and saw defendant, who was looking straight at her, urinating on her face. As the urine ran down her neck and shoulder, N.B. stuck her hand out the window to block the urine and rolled up her window. N.B. testified that the men told her they wanted to drive to a store to get some condoms. Specifically, defendant told her, "We are going to go get some condoms. We are going to get you, bitch. We are going to get you." At that point, defendant ordered N.B. out of the car. N.B. opened her door and was about to get out when the police arrived at the scene and the four men ran.

N.B. testified that she was crying and was horrified and hysterical when the police arrived, but managed to point in the direction the men had run. While she was talking to Chicago police officer Damen Balesteri, she saw defendant. A short time later, the police brought defendant to the ambulance where N.B. was being treated. N.B. testified that as soon as she saw his eyes, she became hysterical. She stated, "I positively identified Michael Waters. I don't forget anybody that urinates on me." After being treated at the hospital, N.B. went to the police station, where she identified the knife that Montgomery had used during the assault.

On cross-examination, N.B. acknowledged that she had lost sight of defendant between the time of the assault and the time the police had him in custody. In response to questions by defense counsel on cross-examination about who urinated on her, N.B. testified as follows:

"Q. Who was it that urinated on you?

A. Defendant Waters.

Q. Only Mr. Waters?

A. Yes.

Q. None of the other people did, correct?

A. No, none of the other people did.

Q. Did you ever tell Detective Crescenzo that it was Waters and one of the other unknown offenders that urinated on you?

A. No, I distinctly remember Waters.

Q. But only Waters, correct?

A. Only Waters.

Q. And you were able to see who was doing it?

A. I was looking at him straight like I am looking at you right now.

Q. And when you spoke to Detective Cain and Sutter right after this happened, did you tell Detective Cain and Sutter that Mr. Montgomery and Mr. Waters had both urinated on you?

A. No. Mr. Montgomery was upset that Waters got some of that urine on him.

Q. Well, it's fair to say, [N.B.], this was extremely traumatic for you, correct?

A. Yes, it was.

Q. And it's fair to say that you were emotionally upset by what was occurring; isn't that correct?

A. Not when it comes to identifying the person that urinated."

On redirect examination, N.B. stated that as she was talking to Officer Balesteri on the scene, she saw defendant walking through a nearby vacant lot and pointed him out to the police. On recross, she stated that defendant was about a block away from her when she pointed him out and that he was walking down a street, heading away from the scene. She also stated that she initially lost sight of all four of the offenders and that about 15 minutes passed between the time the offenders left her car and the time she pointed out defendant to the police. However, on subsequent redirect, she explained that she pointed defendant out to the police right after the police arrived on the scene and that she formally identified defendant when he was in police custody 15 minutes later. Finally, N.B. acknowledged on recross that between the time defendant left her car and the time she pointed him out to the police, she lost sight of him when he ran through a house.

Chicago police officer Damen Balesteri testified that about 11:40 p.m. on the night in question, he and his partner responded to a call on the radio of a rape in progress in the alley behind 6841 South Wood Street. Officer Balesteri and his partner drove to the scene. As they approached N.B.'s car in the alley, Officer Balesteri saw Montgomery jump out of the front passenger seat and run from the scene. Officer Balesteri sent a message over his radio giving a clothing description of Montgomery as he ran. He then spoke with N.B., who was "completely hysterical," crying, and screaming. Her clothes were damp and smelled of urine. According to Officer Balesteri, N.B. managed to relate to him that four men, one of whom had a knife, broke into her car, brought her to the alley, tried to rape her, and urinated on her. Officer Balesteri stated that an ambulance was called and that, as he was attempt-

ing to calm N.B. down, she looked toward 69th Street, pointed, and said, "That's another one right there." Officer Balesteri looked where N.B. was pointing, saw defendant, and radioed a description of defendant to a passing unmarked squad car with directions to detain him. Officer Balesteri then walked N.B. to the ambulance. Officer Balesteri testified that shortly thereafter, the unmarked squad car returned to the scene with defendant. N.B. identified defendant, screaming, "That's him. That's one of them; that's him." Later, Montgomery was also brought back to the scene, where N.B. identified him. After N.B. was treated at the hospital, Officer Balesteri brought her to the police station.

Chicago police officer Jim Lange testified that on the date in question, he and his partner drove toward the scene in response to a call of a sexual assault. As they drove around the area looking for suspects, Officer Lange heard a flash message describing one of the suspects as a black man in his early twenties wearing a blue zippered three-quarter-length jacket. Shortly thereafter, Officer Lange noticed defendant, who was in his twenties and was wearing a blue three-quarter-length jacket, walking westbound on 69th Street. As Officer Lange approached defendant from behind, he saw a marked squad car coming toward them. Defendant turned around and started walking toward Officer Lange. Officer Lange and his partner detained defendant and recovered a knife from his jacket pocket. In court, Officer Lange identified the knife as People's exhibit No. 13. Officer Lange testified that he and his partner drove defendant back to the scene, where N.B., who was hysterical, identified him as one of her attackers, saying, "He's the one; he's the one that punched me. He is the one that raped me or tried to rape me. He is the one that peed on me."

Cathy Stegman, a registered nurse at the hospital where N.B. was treated following the assault, testified that N.B. was distraught when they met in the emergency room. N.B. was crying, stammering, and "[k]ind of hard to understand *** at some times." Her eyes were puffy and she had a laceration on the left side of her nose. N.B. told Stegman that "they" hit her face, pulled her pants down, put a finger in her vagina, fondled her breast, and tried to make her kiss "him." Stegman testified that N.B.'s sweatshirt and jacket smelled of urine, and that N.B. told her two of the men had urinated on her. The sweatshirt and jacket were packaged and given to the police along with the rest of the rape evidence kit. On cross-examination, Stegman reiterated that N.B. told her two men had urinated on her.

Chicago police detective Nick Crescenzo testified that he spoke with N.B. at the hospital about what had happened to her. She had a laceration and a contusion on her nose and some redness to her face.

In addition, she was extremely shaken, crying, visibly distraught, and "just a basket case." Detective Crescenzo further testified that he interviewed defendant at the police station. He advised defendant of his *Miranda* rights, told him of the charges he was facing, and asked whether he wished to make a statement. In response, defendant stated, "If I wanted to rape the girl, I would have raped her. Wouldn't have been an attempt." Detective Crescenzo testified that defendant thereafter refused to answer any questions. On cross-examination, Detective Crescenzo stated that when he spoke with N.B. at the hospital, she told him that defendant and another man urinated on her.

Katherine Davis, a forensic scientist with the Illinois State Police Department of Forensic Sciences, testified that she analyzed the sweatshirt and jacket taken from N.B. Davis determined that the jacket was stained with urine in two areas, but she did not observe any urine stains on the sweatshirt.

Marjorie West, the manager at the gas station where defendant worked prior to his arrest, testified on defendant's behalf that according to the station's time sheet, defendant worked from 2 to 10 p.m. on the day of N.B.'s assault. However, on cross-examination, she acknowledged that she was not at the gas station during those hours and had no contact with defendant on that day.

Shewanna Upchurch testified that she and defendant worked together at the gas station on the date in question. Upchurch had recently gotten a new job, so to celebrate, Upchurch, defendant, and another woman whose shift had just started drank beer and listened to music at the gas station. Upchurch testified that she and defendant stayed at the station until about 11 or 11:15 p.m. She then gave him a ride to 69th or 70th Street and Ashland Avenue between 11:30 p.m. and 12 a.m. Upchurch stated that she learned of defendant's arrest the next day when she went to work. On cross-examination, Upchurch stated that when she spoke with an investigator from the State's Attorney's office, she told the investigator that she left her job at the gas station in March or April 1996 and subsequently quit her new job in August or September 1996.

Defendant testified that on the day in question, he worked at the gas station from 2 to 10 p.m. He stayed after work that night to celebrate Upchurch's new job and did not leave until about 11:10 or 11:15 p.m. Defendant testified that Upchurch drove him to his mother's house at 6931 South Ashland Avenue, where his fiancée had been waiting for him. However, by the time he arrived at his mother's house around 11:30 p.m., his fiancée had left, so he decided to walk to her house at 6820 South Wolcott Avenue. Because the area was known for being violent, he carried a knife for personal protection. As he was

walking westbound on 69th Street, the police stopped him, searched him, and found the knife. Defendant stated that at the police station, he was chained to the wall of the interrogation room. He testified that no one read him his rights, but that an officer repeatedly accused him of trying to rape a woman. According to defendant, he told the officer that he did not know the woman the officer was talking about.

On cross-examination, defendant denied knowing codefendant Montgomery, but acknowledged that his face looked "sort of familiar." He stated that after he was arrested, he was driven to the corner of an alley. From there, he saw a white car and a group of about five women. The police officer driving the car defendant was in asked the women whether defendant was "the one" and the women answered yes. Defendant testified that he told the police he had been at work and had just been dropped off by Upchurch. He denied having said, "If I wanted to rape the girl, I would have raped her. Wouldn't have been an attempt."

Finally, Chicago police officer Allen Cain testified that when he spoke with N.B. at the scene, N.B. stated that both defendant and codefendant Montgomery urinated on her.

In rebuttal, Marcia Calloway, an investigator with the Cook County State's Attorney's office, testified that she and her partner interviewed defense witness Upchurch about 16 months after N.B. was assaulted. According to Calloway, Upchurch first said that she left her job at the gas station in March 1996, but then later said she left that job in August or September 1996. On cross-examination, Calloway testified that she had taken notes when she was speaking with Upchurch but shredded them after translating them into a memo.

Officer Lange testified that when he detained defendant, defendant never said that he had just gotten off work and "didn't do nothing." Furthermore, when he drove defendant to the alley, he did not see a group of about five women in the alley screaming, "He's the one. He's the one." On cross-examination, Officer Lange maintained that when he arrived in the alley with defendant, no one was in the alley other than police officers. However, he acknowledged that "later on," after he had brought defendant to the alley, a crowd of people had begun to gather.

Detective Crescenzo testified that defendant never gave him the name of anyone to call to verify that he had been at the gas station. He stated that he gave defendant his *Miranda* warnings and that defendant indicated that he understood them. In addition, Detective Crescenzo stated that he never raised his voice, repeatedly accusing defendant of raping N.B.

Finally, the parties stipulated that defendant was convicted of a

felony in 1993. The jury after deliberating found defendant guilty as charged.

Following trial, but prior to posttrial motions and sentencing, the trial court allowed defendant's request for DNA testing on the two urine stains on N.B.'s jacket. The Division of Forensic Services of the Illinois State Police was able to profile a DNA sample from one of the two stains. Comparison with defendant's DNA profile revealed that the DNA in that urine stain could not have originated from defendant.

Defendant thereafter filed a motion to vacate the judgment pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1998)) or, in the alternative, a motion for a new trial. The motion was based on the DNA test results. Defendant explained his delay in requesting DNA testing. He asserted that although N.B. testified unequivocally at trial that defendant was the only person who urinated on her, prior to trial, the defense was informed through discovery and through their own investigation that two individuals had urinated on N.B. Based on the pretrial version of events, the defense had believed that DNA testing of the urine stains to exclude defendant would be inconclusive, if not impossible. Attached to the motion were the DNA analysis reports from the Division of Forensic Services; selections of N.B.'s trial testimony, including her assertion that only defendant urinated on her; Detective Crescenzo's supplemental report, noting that N.B. told him "offender Waters and one of the unknown offenders opened her driver's door and both of these offenders urinated on her"; Detective Crescenzo's handwritten general progress report, stating that "two of them urinated" on N.B.; Officer Cain's report, stating "both subjects urinated on victim"; and nurse Stegman's medical notes from the hospital, indicating that "the other 2 urinated on the pt."

At the hearing on the motion, defense counsel responded to the State's argument that defendant was not diligent in presenting the DNA test results. Counsel stated that the public defender investigator who interviewed N.B. prior to trial had indicated that "there was nothing inconsistent with the police reports" and that, up until N.B.'s testimony at trial, the defense team had no basis to question the fact that two men had urinated on N.B. In response to the trial court's question why the assertion that two people had urinated on N.B. stopped them from requesting DNA testing, defense counsel stated as follows:

> "First of all, as the State accurately at least according to my knowledge accurately describes in their motion, generally there is no DNA in urine.

* * *

Additionally, if there had been two people who urinated on her and cells had been found from someone other than Mr. Waters, which in fact is the case here, then the State would make the argument that the other person—it was the other person's cells and not Mr. Waters' cells. Therefore, testing it would be inconclusive."

After considering the parties' arguments, the trial court denied defendant's motion. In doing so, the trial court stated that "aside from the question of due diligence," it agreed with the State that the evidence was sufficient to convict and that the result of the proceedings probably would not be different after a retrial even if the newly discovered DNA evidence were introduced.

## ANALYSIS

### I. Section 2—1401 Motion to Vacate Judgment

Defendant contends that the trial court erred in denying his section 2—1401 motion to vacate the judgment or grant a new trial based on newly discovered evidence. He argues that the DNA evidence is not merely impeaching of N.B.'s credibility, but is also probative of a factual situation different from the one N.B. presented in her trial testimony; *i.e.*, the DNA evidence "goes to the very core of [N.B.'s] identification of [defendant] as one of the assailants." Thus, defendant argues, the jury should be allowed to weigh the DNA evidence in assessing the correctness of the testimony of N.B. Regarding defense counsel's diligence in presenting the DNA evidence, defendant argues that it was not until trial that the defense team learned N.B. was going to testify that defendant was the only person who urinated on her. Defendant explains that he did not seek DNA testing earlier due to N.B.'s pretrial assertions that two people urinated on her and the fact that urine does not usually contain DNA.

■ The purpose of a section 2—1401 petition is to bring to the attention of the circuit court facts which, if they had been known at the time of judgment, would have precluded its entry. *People v. Haynes*, 192 Ill. 2d 437, 463 (2000). As noted in *Haynes*:

"Section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1996)) provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated after 30 days from their entry. Although a section 2—1401 petition is usually characterized as a civil remedy, its remedial powers extend to criminal cases. *People v. Sanchez*, 131 Ill. 2d 417, 420 (1989). A section 2—1401 petition for relief from a final judgment is the forum in a criminal case in which to correct all errors of fact occurring in the prosecution of a cause, unknown to the petitioner and court at the time judgment was entered, which, if then known,

would have prevented its rendition. *People v. Berland*, 74 Ill. 2d 286, 313-14 (1978); *People v. Hinton*, 52 Ill. 2d 239, 243 (1972). A section 2—1401 petition, however, is 'not designed to provide a general review of all trial errors nor to substitute for direct appeal.' *Berland*, 74 Ill. 2d at 314. Points previously raised at trial and other collateral proceedings cannot form the basis of a section 2—1401 petition for relief. *Berland*, 74 Ill. 2d at 314-15." *Haynes*, 192 Ill. 2d at 460-61.

To obtain relief under section 2—1401, a petitioner must set forth specific factual allegations demonstrating the existence of a meritorious defense or claim, due diligence in presenting the defense or claim to the circuit court in the original action, and due diligence in filing the section 2—1401 petition. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986). In order to justify setting aside a judgment on the basis of newly discovered evidence, it must be shown that the new evidence was not known to the petitioner at the time of trial and could not have been discovered by the petitioner with the exercise of reasonable diligence. *People v. Hallom*, 265 Ill. App. 3d 896, 906 (1994). Further, the new evidence must be so conclusive that it would probably change the result if a new trial is granted, must be material to the issues, and must be more than merely cumulative to the trial evidence. *Hallom*, 265 Ill. App. 3d at 906. The petition's allegations must be proved by a preponderance of the evidence. *Smith*, 114 Ill. 2d at 221, 223. Whether to grant a section 2—1401 petition is a decision within the sound discretion of the circuit court. *Haynes*, 192 Ill. 2d at 461. On appeal, the trial court's decision to grant or deny relief pursuant to section 2—1401 will not be disturbed absent an abuse of discretion. *Haynes*, 192 Ill. 2d at 461.

We agree with the trial court that defendant acted with reasonable diligence in this case. First, both the State and defense agree that DNA is not usually found in urine. Second, prior to trial, N.B. consistently reported that two men urinated on her. The police reports likewise noted that N.B. indicated two offenders urinated on her. The public defender investigator who interviewed N.B. before trial found "nothing inconsistent with the police reports." Under that scenario where N.B. reported that two men urinated on her, if the stain had been tested and another man's DNA had been detected, such a finding would not have definitely eliminated defendant as being the second man who urinated on N.B.

Circumstances changed once N.B. testified at trial that defendant was the only man who urinated on her. Given this scenario, there was a possibility that DNA testing could eliminate defendant as the source of the urine stain on N.B.'s clothing. Recognizing this possibility,

defense counsel filed a motion requesting DNA testing of the stains on the day the trial court set for posttrial motions. After examining the record, we find that the trial court did not abuse its discretion in finding that defendant acted with reasonable diligence.

The State argues that because defendant's convictions were not based upon the act of urination, the outcome of the trial would not have been different had the DNA analysis been performed prior to trial and admitted as evidence. We agree that defendant's convictions were not based on the act of urination. However, given the fact that N.B. expressed certainty regarding her identification of defendant because he had urinated on her, the DNA evidence goes to an ultimate issue in this case: Was defendant one of N.B.'s assailants, or was he mistakenly identified while walking to his fiancée's house?

We are mindful that a new trial will not be granted based on evidence that only discredits or impeaches a witness.

> " 'A distinction is to be drawn between evidence which impeaches a witness in the sense that it affects the credibility of the witness, and evidence which is probative in that it presents a state of facts which differs from that to which the witness testified. Newly discovered evidence, the effect of which is to discredit, contradict and impeach a witness, does not afford a basis for the granting of a new trial. If, however, it contradicts a witness by showing facts, a new trial may be ordered when it appears that such new evidence has sufficient probative force or weight to produce a result different from that obtained at the trial which has been had.' " *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997), quoting *People v. Holtzman*, 1 Ill. 2d 562, 568 (1953).

The centerpiece of N.B.'s identification of defendant was the act of urination. The DNA evidence excluding defendant does not merely impeach N.B., but it is probative of a factual situation indicating N.B. misidentified defendant.

On direct examination, N.B. stated, "I positively identified Michael Waters. I don't forget anybody that urinates on me." On cross-examination, N.B. told defense counsel that she "distinctly remembered" that defendant was the person who urinated on her, stating, "I was looking at him straight like I am looking at you right now." When asked whether it was fair to say that she was emotionally upset by what was occurring, N.B. responded, "Not when it comes to identifying the person that urinated."

The State recognized that the act of urination was at the core of N.B.'s identification of defendant and emphasized this point in closing arguments. In the second paragraph of opening closing arguments, one of the prosecutors implored the jury as follows:

"Her identification of the defendant, ladies and gentlemen, was unequivocal. It was absolute. Recall the exact words she used on that stand when she recalled her memory, of the fact of Michael Waters. 'I caught the details of his face. I distinctly remember the face of the man that urinated in mine. I looked him straight in the eye as I'm looking at you' she said to [defense counsel]. She was in a word positive. Make no mistake about it. [N.B.] will never forget the face of the man, Michael Waters, that committed these despicable acts."

Later, in rebuttal closing arguments, the other prosecutor also stressed the fact that N.B. based her identification of defendant on the act of urination:

"But, you know, folks the one thing that's never changed through any of this is that she unhesitating, unwavering, a hundred percent said that is the man who peed on her. Who urinated on me."

■ Given N.B.'s "unhesitating, unwavering" testimony that she was able to positively identify defendant because she does not "forget anybody that urinates" on her, together with her testimony that only defendant urinated on her, the DNA evidence as developed thus far indicates misidentification in this case. Based on this record, if the DNA evidence were presented to a jury, the jury could reasonably find that N.B., though sincere, innocently and mistakenly identified defendant as one of her attackers. The DNA evidence does not merely impeach or contradict N.B.'s testimony, but it is probative of a factual situation different from that to which N.B. testified. We conclude that the trial court abused its discretion in finding that the outcome of the trial probably would not be changed upon a retrial even if the newly discovered DNA evidence were introduced. Accordingly, we reverse and remand for a new trial so that the trier of fact may have the opportunity to consider the DNA evidence. Our ruling, however, in no way limits the State from conducting further investigation of the DNA evidence.

## II. Violation of Discovery Rules

Defendant's second contention is that the State violated his due process right to a fair trial by failing to inform the defense team that, in contrast to her pretrial assertions, N.B. would be claiming at trial that defendant was the only man who had urinated on her. Defendant argues that the State knew of the change in N.B.'s version of events by the time codefendant Montgomery pleaded guilty, which was the day before defendant's trial began. Based on the argument that the withheld information eventually led to the "suggestion of a factual situation different from that to which the prosecution's key witness testified," defendant contends that the violation of Supreme Court Rule 412(c) (134 Ill. 2d R. 412(c)) warrants the granting of a new trial.

Given our disposition on the section 2—1401 issue above, reversing and remanding for a new trial, we need not address this contention.

## III. Consecutive Sentences

Defendant's next two arguments attack his consecutive sentences. Defendant contends that his consecutive sentences must be vacated because they violate *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and because there was a substantial change in the criminal objective between the occurrence of the armed robbery and the aggravated criminal sexual assault. We have granted defendant a new trial and it would be premature to consider defendant's sentencing claims. We note, however, that in *People v. Wagener*, 196 Ill. 2d 269, 286 (2001), the Illinois Supreme Court held that "*Apprendi* concerns are not implicated by consecutive sentencing." See also *People v. Carney*, 196 Ill. 2d 518 (2001) (holding *Apprendi* does not apply to consecutive sentencing).

## IV. Jury Instructions

■ Defendant's final contention is that he is entitled to a new trial because the jury was instructed with a version of Illinois Pattern Jury Instructions, Criminal, No. 3.15 (3d ed. 1995) (hereinafter IPI Criminal 3d No. 3.15).

IPI Criminal 3d No. 3.15 states as follows:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[or]

[2] The witness's degree of attention at the time of the offense.

[or]

[3] The witness's earlier description of the offender.

[or]

[4] The level of certainty shown by the witness when confronting the defendant.

[or]

[5] The length of time between the offense and the identification confrontation." IPI Criminal 3d No. 3.15.

In this case, the jury was read this exact instruction, including the conjunction "or" between each factor, but excluding the numbers preceding the factors.

*People v. Gonzalez*, 326 Ill. App. 3d 629 (2001), *appeal denied*, 198 Ill. 2d 623, held that contrary to the implication caused by the com-

mittee's use of "[or]" in the instruction, the listed factors are not mutually exclusive, but are all to be considered in determining the reliability of the eyewitness identification testimony presented. *Gonzalez*, 326 Ill. App. 3d at 637-38. *Gonzalez* noted that the purpose of the committee's use of "[or]" between the factors is to inform the user that only the factors supported by the evidence should be given. *Gonzalez*, 326 Ill. App. 3d at 637-38. We note that for the reasons previously discussed regarding the DNA evidence, we have reversed and remanded for retrial. Upon retrial, if this instruction is given, the better approach would be to list the relevant factors supported by the evidence without using the conjunction "or."

## CONCLUSION

The judgment of the circuit court is reversed and the cause is remanded for a new trial consistent with this opinion. The results of the DNA testing, including the lack of detection of defendant's DNA within one of the urine stains on N.B.'s clothing and the detection of DNA not belonging to defendant within one of the urine stains on N.B.'s clothing, may be admitted into evidence upon retrial.

The record contains sufficient evidence for the jury to have found defendant guilty beyond a reasonable doubt. There is no double jeopardy impediment to a new trial. *People v. Porter*, 168 Ill. 2d 201, 215 (1995). We also note that we have made no finding as to defendant's guilt that would be binding on retrial. *People v. Jones*, 175 Ill. 2d 126, 134 (1997).

Reversed and remanded.

GALLAGHER, P.J., and BUCKLEY, J., concur.