SIXTH DIVISION

September 27, 2002

No. 1-01-1850

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

) No. 00 CR 10518

)

LARRY BROOKINS, ) Honorable

) Mary Ellen Coughlan,

Defendant-Appellant. ) Judge Presiding.

JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Larry Brookins, appeals his conviction and 10-year sentence for residential burglary.  Upon appeal, defendant argues that the circuit court erred in instructing the jury with respect to identification testimony of a witness.  We affirm.

At trial, Regina Scolaro identified defendant as the burglar.  Ms. Scolaro's testimony is central both to defendant's conviction and to his one issue upon appeal, and so we set forth Ms. Scolaro's testimony in some detail.

Ms. Scolaro testified during direct examination that on April 7, 2000, she was living at 1956 North Burlington in Chicago, "directly east" of 1955 Halsted Street, where the residential burglary occurred.  Ms. Scolaro noted that she "share[d] an alley with the people on Halsted."

Ms. Scolaro testified that at about 1 a.m. on April 7, 2000, something "unusual" happened:

"Q. What happened?

A. I–my bedroom has a window, a big window, and it overlooks my alley, and there is a pretty bright light in the alley.  And I happened to see the defendant walking down the alley and–

Q.  Did you look out the window for any particular reason?

A. No, I just-–I mean I was on my way to bed, and as I get into bed, the window is there and I just looked out my window.

* * * 

Q. Now *** you were on the third floor, is that correct?

A. Yes.

Q. Where was this light coming from in relation to [defendant]?

A. There was a – as I looked out over my alley, it's, I have a, directly below me is a little patio, and then there is my garage, and there is a light post right here as I look out.  It's on the–-

Q. Indicating to your right?

A. To my right, yes.

Q. And it's–-

A. It's a light, and it's very bright.  I mean my alley is very well lit. 

Q. Was there anything obstructing your view of [defendant] at that time?

A. Absolutely nothing. *** [S]pecifically, as he passed underneath the light, my bedroom light was off, so you could not see, as far as I knew, into my bedroom, but I could clearly see outside, and as he walked underneath the light, he looked right up at my window and *** I got a very good view of his face. ***

* * * 

Q. Where did you see him go, if anywhere?

A. I saw him going through a construction site.  There's a townhome or apartment building, at the time it was in the early stages of development, and it was quite a mess.  There was a lot of construction and stuff there.  And he was rummaging around in there, and there is no garbage or anything [like] that.  It didn't look like he was looking for food.  He looked like he was looking for something else, and I thought that was unusual.

* * * 

Q. When you say he was in this construction site, had you lost sight of him up to that point?

A. Not up to that point.  I lost sight of him, and then he would reappear and disappear and reappear.  And I thought that was really unusual, and I continued to watch.  

Q. As he was doing those things and you were watching, did you do anything at that point?

A. At that point I had watched him for [a] couple of minutes.  And then when I–- I don't remember how much time exactly went by, but there was a point when I thought he seems suspicious, his behavior is unusual, and I called 311. ***

* * * 

Q. What did you see happen next?

A. I saw him actually come towards my house.  And my neighbor, who lives directly next door to me, has a wooden gate and they have it shut, and I did see him go through there.  And then at that point, I lost sight of him because he was directly below me and I couldn't see him. 

* * * 

Q. Did he ever appear again in your sight?

A. Yes, he did.

Q. Where was that?

A. He reappeared and came out the same way that he went through that wooden gate.  Then he was back in my alley again.  Then I continued to watch and I saw him go over to the victim's house.  He was in their backyard and he was on the balcony, walking back and forth. ***

* * * 

Q. This was at 1955 North Halsted?

A. Yes.

Q. What happened next?

A. I continued to watch him walk back and forth and then I saw him go down the stairs, and I lost sight of him, and then I looked up and saw him a couple minutes later walking around in the house.

Q. How were you able to see in the house?

A. The house is an A frame house, and the whole back of the house is glass, so you can see. ***

* * *

Q. Was [sic] there lights on in the house that you were looking into?

A. No lights on in the house.  However, it was well lit because of the lights on Halsted.  He has quite a few windows in front of his house as well, and the blinds were open.  There is a streetlight right out there, and I could see the light coming in from Halsted and I was able to see the defendant in the house walking around going through the stuff.

* * * 

Q. And were you able to see what the defendant was wearing at that time?

A. Yes.  It was all black.

Q. Could you see what he was doing inside the building?

A. Yes, I could.

Q. What was that?

A. He had some sort of a, I don't know what it was.  I could see the shape of it, in his hands.  I don't know if it was a pipe, I don't know if it was a–-I have absolutely no idea what it was.  It was a long type like object in his one hand, and he was going through just opening things, going through things.

* * * 

Q. What happened next?

A. I called 911 at that point ***.

Q. And after you called 911, what happened?

A. The police showed up in my alley.

Q. How soon after you made that call?

A. Very quickly. ***

* * * 

Q. And *** you stayed in your bedroom until you heard the police say 'you're under arrest'?

A. Yes.

Q. What did you do then?

A. Then I went outside and jumped over the fence in the back.  And I was mad at him, and I said, 'That is the mother f----- who I saw in the house.'

Q. And when you said that, who were you indicating?

A. The defendant.

* * * 

Q. At that time, what was the defendant wearing?

A. He had a jacket on that I had originally seen him wearing when he walked down the alley.  It was cream colored on the outside.

* * * 

Q. At what point was the defendant wearing this jacket?

A. The defendant had the jacket on when I saw him walking down the alley, and when I got that, almost still life picture of him when he walked right under the light and looked right up at me.  I mean I made eye contact with him whether he knew it or not.  I looked right into his eyes and specifically noted what he had on. And then when they took him, when he came out of the house and when they arrested him, he had that jacket on." 

During cross-examination, Ms. Scolaro testified:

"Q. Okay.  The lighting that you're indicating there is from Halsted Street, right?

A. Yes, it is. 

Q. It's the streetlights that are on Halsted Street?

A. Yes.

* * * 

Q. And it's back lighting this interior of this house, correct?

A. It's shining through the front window.

Q. So at that point what you're seeing is shadows of a person, correct?

A. It was not a shadow.  It was–-I could see the person.  I could see very well into the house.  It's all glass in the back, there is no curtains, nothing.  There were no leaves on the trees.  There was bright light.  I could see the defendant walking through the house. 

Q. There was [sic] no lights in the house, correct?

A. As far as I know, the only light that was in the house was a VCR flashing.  But I could see very well inside.  The light was very sufficient coming through the front window.

Q. So you're able to see from your window, across the patio area, across the garage, across the alley, through the yard, into the house, and see a VCR flashing?

* * * 

A. You keep bringing this up.  You're looking past the garage and then the alley.  You're making it sound[] so dramatic.  It's not far and my eyes don't pass over each other.  And then there comes the house.  It's a house with all windows, no curtains.  My house is on the third level, direct shot in.

Q. And from that–-

A. It's not as complicated as you're making it sound.

Q. And from that distance, from that distance you could see the VCR flashing?

A. Absolutely."

Officer Dominick Sarlo testified that at around 1:20 a.m. on April 7, 2000, he and his partner responded to a suspicious person call at 1955 North Halsted Street.  Officer Sarlo saw defendant exit a yard across the alley from 1955 North Halsted Street.  The officers detained defendant, who was carrying a bag containing about $140 in change.  Ms. Scolaro came out and identified defendant, after which defendant said, "I just took the change."  The officers placed defendant under arrest and walked over to 1955 North Halsted Street, where "it appeared that the door was kicked in.  The door jamb was all broken out by the lock area."  

Jerry Armstrong testified that he lives at 1955 North Halsted Street, that he does not know defendant, and that he did not give defendant permission to enter his house on April 7.

The jury convicted defendant of residential burglary and the trial court sentenced defendant to 10 years in prison.  Defendant filed this timely appeal.

Defendant's only argument upon appeal is that the trial court erred in instructing the jury with respect to Ms. Scolaro's eyewitness identification testimony.  

Defendant concedes that he waived review of this issue by failing to object to the instruction at trial or raise the objection in his posttrial motion.  See 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  However, waiver is a limitation upon the parties, not the court.  
People v. Williams
, 188 Ill. 2d 293, 301 (1999).  We choose to address the issue upon its merits.

Defendant contends that the trial court denied him a fair trial by giving a pattern jury instruction that misstated the law with respect to evaluating Ms. Scolaro's eyewitness identification testimony.

The trial judge gave the following instruction to the jury based upon the wording of Illinois Pattern Jury Instructions, Criminal, No. 3.15 (3d ed. 1992) (hereafter, IPI Criminal 3d):

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including but not limited to, the following:

The opportunity the witness had to view the offender at the time of the offense. 

or

The witness's degree of attention at the time of the offense.

 or

The witness's earlier description of the offender.

or

The level of certainty shown by the witness when confronting the defendant.

 or

The length of time between the offense and the identification confrontation."

Defendant argues that by using the term "or" between each of the five factors, the instruction erroneously informed the jury that it could select just one of the listed factors to determine the credibility of the identification testimony.  Defendant argues that under well-established case law, the jury was required to consider all five factors.  See, 
e.g.
, 
People v. Slim
, 127 Ill. 2d 302 (1989); 
People v. Gonzalez
, 326 Ill. App. 3d 629 (2001).  Defendant argues that the instructional error was compounded when the prosecutor emphasized the allegedly erroneous wording of the instruction.  Specifically, the prosecutor stated, "Now, they (the five factors) are all separated, you can consider them as separate."

This court addressed this issue in 
People v. Gonzalez
, 326 Ill. App. 3d 629 (2001).  In 
Gonzalez
, the trial court gave the same instruction at issue here.  In analyzing whether the trial court erred in giving the instruction, the appellate court first noted the wording of IPI Criminal 3d No. 3.15:

"'3.15 
Circumstances of Identification

When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[or]

[2] The witness's degree of attention at the time of the offense.

[or]

[3] The witness's earlier description of the offender.

[or]

[4] The level of certainty shown by the witness when confronting the defendant.

[or]

[5] The length of time between the offense and the identification confrontation.'"  
Gonzalez
, 326 Ill. App. 3d at 637-38, quoting IPI Criminal 3d No. 3.15.

The appellate court then examined the committee note following IPI Criminal 3d No. 3.15.  The committee note explains that the instruction was compiled from factors established by existing case law and cites to 
Manson v. Brathwaite
, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977), 
People v. Manion
, 67 Ill. 2d 564 (1977), and 
People v. Slim
, 127 Ill. 2d 302 (1989).  The appellate court examined those cases and determined that they  state that all five factors are to be considered and weighed in determining whether identification is reliable.  
Gonzalez
, 326 Ill. App. 3d at 639.

The appellate court determined that the purpose of the Committee's use of the word "[or]" between the factors listed in IPI Criminal 3d No. 3.15 is to inform the user that "'only the particular *** factors that are supported by the evidence should be given.'"  
Gonzalez
, 326 Ill. App. 3d at 639, quoting 
People v. Lewis
, 165 Ill. 2d 305, 354 (1995).  In support, the appellate court cited the "User's Guide" to the pattern jury instructions.  The User's Guide states:

"IPI Third employs two conjunctive forms.  The word 'and' is used to indicate additional, required language.  The word 'or' is used to separate possible alternatives.  A bracketed 'or' ('[or]') is used when the user must choose between alternative paragraphs or propositions that may be given as part of the instruction when more than one alternative is applicable."  (Emphasis omitted.)  
Illinois Pattern Jury Instructions, Criminal, User's Guide (3d ed. 1992).

The appellate court further noted (
Gonzalez
, 326 Ill. App. 3d at 639-40) that the committee notes to IPI Criminal 3d No. 3.15 refer the user to sample set 27.02 for an example of how to use IPI Criminal 3d No. 3.15.  The example provided in sample set 27.02 does not place the term "or" between the factors listed in IPI Criminal 3d No. 3.15.

The appellate court found that a jury would be confused and unable to reconcile the court's instruction to "consider all the facts and circumstances in evidence" with its use of the term "or" between each factor.  
Gonzalez
, 326 Ill. App. 3d at 640.

Finally, the appellate court noted the prosecutor's directive to the jury emphasizing the erroneous instruction in closing argument.  
Gonzalez
, 326 Ill. App. 3d at 640-41.  The appellate court determined that the instructional error was not harmless, as the evidence in the case was close and the erroneous instruction may have contributed to the jury's guilty verdict.  
Gonzalez
, 326 Ill. App. 3d at 641.  Accordingly, the appellate court reversed and remanded for a new trial.  
Gonzalez
, 326 Ill. App. 3d at 641.

We follow the well-reasoned opinion in 
Gonzalez
 and hold that the trial court here erred in giving a version of IPI Criminal 3d No. 3.15 using the word "or" between each of the five factors.

However, our analysis is not finished, as we still must examine whether the trial court's error was harmless.  First, as in 
Gonzalez
, we examine whether the evidence here was closely balanced.  

Defendant claims that the evidence was closely balanced here because there were no burglary tools or fingerprint evidence linking defendant to the crime.  Defendant also claims that Ms. Scolaro's identification testimony was suspect because she was too far away, and the lighting was too dim, for her to clearly see inside the victim's house.  Further, defendant points out Ms. Scolaro testified at trial that she could not remember telling one of the detectives that she had seen defendant turn his jacket inside out.  Finally, defendant questions why Ms. Scolaro did not testify about hearing any sounds of defendant breaking into the victim's house or why she failed to testify about hearing the victim's dog barking.

The evidence in this case was not closely balanced.  As extensively set forth above, Ms. Scolaro consistently testified that she looked out her third-floor bedroom window and saw defendant walking down the alley.  Ms. Scolaro explained that the lighting in the alley was "very bright" and that defendant looked up so that she got a "very good view of his face."  Ms. Scolaro further explained that she saw defendant walk through a construction site, then she saw defendant walk through her next-door neighbor's wooden gate.  She saw defendant walk to the victim's house, where she lost sight of him for a couple of minutes, until she saw him again walking inside the victim's house.  Ms. Scolaro explained that she could see clearly into the house because "the whole back of the house is glass" and there were no curtains on the windows blocking her view.  Ms. Scolaro disagreed with defense counsel's insinuations that she was too far away, and the victim's house was too dimly lit, for her to see inside.  Ms. Scolaro explained that the lighting on Halsted Street was sufficient for her to see inside the house, that her house was "on the third level, direct shot in" to the victim's house, and that her view inside the house was so good that she could even see the victim's VCR flashing.  

Ms. Scolaro further testified that after the police responded to her 911 call and arrested defendant, she ran outside and immediately identified him.  Ms. Scolaro's testimony was corroborated by Officer Sarlo, who testified that he arrived at the scene and found defendant across the alley carrying a bag of change.  Ms. Scolaro ran out and identified defendant; defendant admitted that he had taken the change.

Given the uncontradicted testimony of Ms. Scolaro and Officer Sarlo, we cannot say that the evidence of defendant's guilt was closely balanced.

Next, as in 
Gonzalez
, we examine whether the result of the trial would have been different if the proper instruction had been given.  We find that even if the trial court had given the proper instruction, and expressly instructed the jury to consider all five factors, the outcome of the trial would have been the same.  With regard to the first factor, the opportunity the witness had to view the offender at the time of the offense, Ms. Scolaro testified to her opportunity to view defendant through her third-floor bedroom window; that the lighting was very bright and that she got a good look at defendant's face; and that she could clearly see through the windows of the victim's house at the time defendant was committing the residential burglary.  With respect to the second factor, the witness's degree of attention at the time of the offense, Ms. Scolaro testified that she thought defendant was acting suspiciously, and so she continued to watch him from the time he was first in the alley until he appeared inside the victim's house.  With respect to the third factor, the witness's earlier description of the offender, Ms. Scolaro consistently testified that when she first saw defendant, he was wearing a cream-colored jacket, but that he later took off the jacket, revealing that he was otherwise dressed all in black.  With respect to the fourth factor, the level of certainty shown by the witness when confronting the defendant, Ms. Scolaro testified that when she confronted the defendant, she stated, "That is the mother f----- who I saw in the house."  With respect to the fifth factor, the length of time between the offense and the identification confrontation, Ms. Scolaro testified that she confronted defendant only a few minutes after defendant had committed the offense.  

All five factors support the jury's finding that Ms. Scolaro correctly identified defendant as the burglar.  Thus, the outcome would have been the same even if the trial court had expressly instructed, and the prosecutor had argued, that the jury should consider all five factors when considering Ms. Scolaro's testimony.  Since the instructional error (and the prosecutorial comment thereon during closing argument) did not affect the outcome of the trial, the error was harmless.  See also 
People v. Furdge
, No. 1-01-2220, slip op. at 15-16 (July 26, 2002)(holding that the trial court erred in using the word "or" when giving IPI Criminal 3d No. 3.15, but that the error was harmless where the evidence was not closely balanced and the verdict would have been the same even if the correct instruction had been given.)

The deletion of the bracketed "or" from the instruction would eliminate this problem. Perhaps, the Committee could reexamine the bracketed "or" in the instruction and recommend its removal for the sake of clarity.

Accordingly, we affirm the circuit court.

Affirmed.

GALLAGHER and O'MARA FROSSARD, JJ.'s concur.