THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTOINE SMITH, Defendant-Appellant.

First District (4th Division)    No. 1—02—1931

Opinion filed March 31, 2005.—Rehearing denied May 6, 2005.

THEIS, J., specially concurring.

Michael J. Pelletier and Samuel Algozin, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kathryn Schierl, and Amy Watroba Kern, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Defendant Antoine Smith was charged with three counts of first degree murder (720 ILCS 5/9—1(a)(1) through (a)(3) (West 2000)), as well as attempted armed robbery (720 ILCS 5/8—4, 18—2 (West 2000)), in connection with a botched robbery at the Citgo gas station on Green Bay Road in Evanston, Illinois. During the attempted armed robbery, the cashier, James Pappas, was killed. After a jury trial, defendant was convicted of both first degree murder and attempted

armed robbery and sentenced to a term of natural life imprisonment. On appeal, defendant argues (1) the circuit court erred in denying his request to call an eyewitness during his motion to suppress the identification testimony of that witness; (2) the evidence at trial was insufficient to support either conviction; (3) the State improperly used a codefendant's prior consistent statement as substantive evidence; (4) the circuit court misinstructed the jury as to how it was to consider identification evidence; (5) the prosecutor elicited irrelevant testimony at trial and made improper and inflammatory comments during closing argument; (6) the circuit court failed to instruct the jury as to the definition of "wanton cruelty"; (7) the State failed to prove beyond a reasonable doubt that the murder was committed in a brutal and heinous manner, indicative of wanton cruelty; and (8) the circuit court's imposition of a life sentence was excessive. For the following reasons, we affirm defendant's convictions and sentence.

## BACKGROUND

Before trial, defendant sought to suppress the identification testimony of eyewitness Dawn Lockhart. Instead of attempting to secure Lockhart's presence at the suppression hearing through procedures set out in the Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings (725 ILCS 220/3 (West 2000)) (the Witness Attendance Act) because Lockhart had moved out of state, one of defendant's investigators tried to serve her with a subpoena. The State filed an emergency motion to quash defendant's subpoena, arguing that the subpoena was invalid because defendant failed to follow the procedures under the Witness Attendance Act, and Lockhart's testimony was not relevant for the issues raised in defendant's motions. The State noted that Lockhart had moved out of state because of her fear of defendant. The circuit court quashed the subpoena, but postponed ruling on whether the State had to produce Lockhart for the suppression hearing.

After calling six police officers during the suppression hearing, defense counsel renewed his "request to have Dawn Lockhart produced." Though noting that "[a]t this point there's been no evidence of any suggestive identification," the circuit court said that it would allow defendant to call Lockhart on the next court date, strictly limiting any questioning, however, to "the identification process, the photographs she was shown, the lineup she was shown."

On that next court date, the State renewed its objection to defendant calling Lockhart during the suppression hearing. Characterizing defendant's request as "unprecedented," the State argued that "[g]enerally, the law is that civilians do not testify at motions to sup-

press identification unless there has been a preliminary showing there is some sort of suggestiveness at the lineup procedure." In support of this proffered statement of law, the prosecutor cited *People v. Strong*, 274 Ill. App. 3d 130, 653 N.E.2d 938 (1995), as "exactly on point." The circuit court sustained the State's objection, finding:

> "At this point I see no reason to call Dawn Lockhart. If the testimony of Dawn Lockhart, on direct and cross examination should give rise, the jury will be removed from the room and you will be allowed to, defense, to reopen the motion to suppress identification based on both suggestive identification and photographic identification. Based on what I heard to this point of the several days of testimony that we have heard on this case and the officer from [North Regional Major Crimes Task Force] and Evanston and so on, at this point I think that the movant has failed to sustain their burden and those motions will be denied."

The court reiterated, however, that "[i]f I hear any evidence to the contrary, I'll reopen."

At trial, Maria Pappas, the victim's sister, testified that the last time she saw her brother alive was at her house on Palm Sunday, the night before his murder. She stated that he slept there that night so that he could open up the gas station for his godfather, Dean Hasapis, the next morning.

Dawn Lockhart testified that, on April 13, 1998, at approximately 6:35 a.m., as her mother was driving her to work, they stopped at the Citgo gas station so she could buy a pack of cigarettes. When she went inside the store, she did not see the cashier. Peering behind the cashier's counter, she saw defendant bent down on his knees, moving his right fist up and down, hitting a man who was lying on the floor.

Lockhart testified that she had seen defendant sporadically on "Howard Street, sometimes, off Church Street, Dempster" for a period of about a year prior to April 1998. Though she and defendant were not friends and she would not necessarily say hello to him, she testified that she recognized him. She also testified that she believed her aunt was dating a man who was related to defendant. She further testified that, though she might not have known defendant's name, she "knew his face" from the streets.

She stated that she saw something in defendant's hand, but could not tell what it was. After hearing a noise, she and defendant looked at each other. She stated that even though defendant was wearing a nylon across his face, she could see his eyes, nose, upper cheekbones, and forehead. After they looked at each other, she ran outside to her mother's car.

As she was leaving the store, she saw a Hispanic couple drive into

the gas station. After motioning to them not to enter the store, she and her mother drove away. As they drove and as she told her mother what she had seen, she noticed defendant running "kitty-corner right across from where [they] were driving." She then saw a police officer parked on the side of the road. After explaining to the officer what she had seen, she went home.

Though her mother told her not to get involved, she agreed to go to the Evanston police department. While at the station, she looked through various mug books, but she did not see defendant's photo. She also described the man she had seen to a police sketch artist, but she testified that she did not "fully cooperate with the making of that sketch" or the investigation because she "really didn't want to be involved with any of this." She testified that she was not "completely candid with the police" because she "wanted them to leave [her] alone."

On April 22, 1998, eight days after the murder, she was asked to view a lineup at the Evanston police department. Though she saw defendant in that lineup, she testified that she did not identify him because she was nervous and scared. She stated that when she saw defendant, she told the officers present in the room that she "wanted to go home," that she would not cooperate, and that she would not "tell them anything." She testified that she subsequently saw defendant on the streets of Evanston several times after the murder.

In March 2000, Detectives Glenn Cannon and Jim Hutton came to her home and asked her to "get involved again" in the investigation. Though initially she refused, a few days later she went to the Evanston police department but left inexplicably. The next day, she returned to the police station and met with Cannon and Evanston Police Chief Frank Kaminski, telling them that she wanted to cooperate. After viewing a series of photographs, she identified defendant as the man she had seen in the gas station. She was also shown a photo of the lineup conducted on April 22, 1998, and, again, identified defendant.

Jose Cruz Torres testified that on April 13, 1998, at approximately 6:35 a.m., he and his wife were driving down Green Bay Road in Evanston when they pulled into the Citgo gas station to buy some coffee. As he was walking toward the front door of the store, two women came out "in a hurry." One of the women, who he later learned was Lockhart, looked afraid and signaled to him not to enter the store. The women then got into a car and drove off. A few seconds later, a man dressed in "black pants, black [Nike] shoes, black sweatshirt with a hoodie and blue ski mask" came out of the store.

Torres testified that the man was between 5 feet 6 inches and 5 feet 8 inches, about 165 to 185 pounds, and had a husky build. Torres

testified that the man was wearing black gloves and that his right hand was tucked inside his sweatshirt. He stated that it looked like he was "pulling something or hiding something" in his right hand. Because the man was wearing the ski mask, however, all Torres could see was the man's eyes. The man looked at him and then ran across Green Bay Road toward Ashbury Street. When Torres went inside the store, he found Pappas lying against a file cabinet inside the cashier's area. Seeing this, Torres ran outside to a pay phone and called 911. As he was dialing, he saw a police officer driving past the gas station. After flagging down the officer, they both went inside the store and tried to open the door to the area where Pappas was lying. When they could not open it, Torres and the officer went outside and waited for the ambulance.

Detective Cannon testified that he conducted a lineup on April 22, 1998. He stated that Lockhart, who viewed the lineup for about five minutes, was nervous, convulsing, violently shaking, crying, sobbing, and clutching Kaminski's arm. Lockhart repeatedly told him that she wanted "it to be over" and that she wanted to get out of there. When he realized that they "weren't going to get anywhere that evening," he ended the lineup.

Cannon testified that in March 2000, he and Hutton went to talk to Lockhart at her home. He told her that they were still investigating Pappas' murder and asked her if she remembered anything that she had not previously told them. She told him that she did not remember anything new. She stated that she had been "spending the last couple of years trying to block it from her memory" and that she was recently having nightmares about what she had seen.

A few weeks later, Cannon was told that Lockhart was at the police station, but by the time he got downstairs to meet her, she had left. Then, on April 13, 2000, he met with Lockhart at the police station. She told him that she knew who killed Pappas and that she wanted to identify him. Cannon testified that Lockhart identified defendant from a photo array.

Dean Hasapis, the victim's godfather and owner of the Citgo gas station, testified that Bobby Fomond had worked at his gas station since 1995. Fomond's duties included working the cash register, cleaning, filling stock, and going to the bank. He stated that Fomond had gone to jail in 1997, but had returned to work in December of that year.

Hasapis testified that there was a safe located in the washroom of the store where he would put the money earned each day. Each Monday, someone would take the money, normally around $8,000 to $9,000, out of the safe and bring it to a bank. To open the safe, one

needed both the combination and a key. Hasapis testified that though both he and Pappas knew the combination, only he had the key.

Hasapis stated that Pappas was at his home for Palm Sunday, a "special holiday for [him] and [his] family." Because Hasapis was on vacation, Pappas offered to open the store that Monday morning. Hasapis did not give Pappas the key to the safe.

Hasapis testified that the videocassette recorder (VCR) for the security camera had not been working and that he told Fomond to have it fixed. On the day of the murder, it had not been replaced. On the morning of April 13, 1998, Hasapis received a phone call from an employee who told him that Pappas had been shot in the store. He stated that no money had been taken from either the cash register or the safe.

Jimmy Tillman testified that, on April 13, 1998, at approximately 7 a.m., while walking to his daughter's house, he saw defendant, wearing dark clothes, walking south on Green Bay Road, away from the Citgo gas station. His daughter's house was about five blocks from that gas station. Tillman knew defendant and crossed the street to talk to him. Defendant gestured to him, but continued to walk past him. As Tillman continued to walk, he looked behind him and saw defendant cross the street, turn around, and head north toward the gas station. He later heard about the attempted robbery and murder at the Citgo gas station and, in January 2000, he identified defendant as the man he saw on Green Bay Road on the morning of the murder.

Robert Fomond testified that he was currently living in the witness protection program at the Cook County jail. As part of an agreement with the State's Attorney's office, in exchange for his testimony, Fomond was to serve 11 years in the Illinois Department of Corrections for attempted armed robbery, but the murder charges against him were dismissed.

Fomond testified that he began working at the Citgo gas station in 1995, and, after he got out of prison in 1997, he returned to that job. He also moved a few houses away from defendant and they became friends. Fomond stated that Hasapis normally opened the store on Mondays and that only he had a key to the safe.

After work on April 10, 1998, Fomond went to Twigg's bar on Howard Street in Chicago. When he got there, he saw defendant standing outside. After discussing how they both were in need of money, he and defendant decided to rob the gas station. Initially, defendant suggested that they stage a "fake robbery," where he would rob Fomond while on his way to the bank. They decided instead to rob the store on a Monday, when the safe would have the most amount of money in it. Fomond told defendant where the safe was located and the best time to commit the robbery.

The two of them decided that they would buy drugs with the money. Fomond testified that he expected his share to be between $1,000 to $2,000. Defendant told him that he would get "one of them things" to commit the robbery, which Fomond took to mean a gun. Defendant also said that he was going to wear a mask and dark clothing so no one could identify him.

On April 11, 1998, while Fomond was at work, defendant came into the gas station store. Defendant noticed the security cameras and asked Fomond whether they were working. After Fomond told defendant that the VCR was broken, defendant looked around and then left.

On April 13, 1998, at approximately 7:30 a.m., Fomond was awoken by Detective Springer, who told him that a murder had occurred at the gas station. Fomond testified that he went to the Evanston police station and spoke to the police. He did not tell them about his and defendant's plan to rob the gas station.

At approximately 4 p.m., while driving, Fomond saw defendant driving in the opposite direction. After they flagged each other down, defendant told him that "it didn't go down right." Defendant said that "he got into a tussle with the guy, and—and he had to give it to him," which Fomond took to mean that defendant shot him. Defendant reassured Fomond that he "didn't leave them nothing to go on."

On April 14, 1998, Fomond was again picked up by police investigators, but he did not tell them about either his or defendant's involvement. Instead, he told them about a separate incident during which a "neighborhood guy" had used a stolen credit card at the gas station. Fomond admitted that he had allowed the man to use the stolen credit card because he received some cigarettes in return.

On April 16, 1998, the police again picked up Fomond, but, again, he did not tell them about either his or defendant's involvement. After talking with the police, Fomond called defendant and went over to his house. He told defendant that the police were asking questions, but defendant told him not to worry. Defendant also told Fomond, "you didn't tell me that old boy was goin' to be there." While in defendant's bedroom, Fomond saw a pair of black Nike gym shoes.

On April 17, 1998, the police picked up Fomond, who identified Mansfield Wallace as the man who had used the stolen credit card. That night, Fomond met again with defendant, who again told him not to worry about the police.

Finally, on April 21, 1998, the police picked up Fomond and told him that his "credit card story wasn't matching out." At that point, Fomond told the police about his conversation with defendant at Twigg's bar and their meetings subsequent to the murder.

Once Fomond's direct and cross-examinations had concluded, defense counsel made a motion *in limine* to bar the State from having Assistant State's Attorney Jonathan Lerner (ASA Lerner) testify as to the substance of the written statement Fomond gave to him on April 21, 1998. After the circuit court denied defense counsel's motion, ASA Lerner read Fomond's written statement to the jury. Over defendant's objection, the circuit court subsequently allowed the statement to go back with the jury during its deliberations.

After the State rested and the circuit court denied defendant's motion for a directed verdict, Sergeant James Hutton testified on behalf of defendant. Hutton testified that, according to his arrest report, defendant weighed approximately 230 pounds on the day of his arrest on April 21, 1998.

Officer Christine Bell testified that she interviewed Lockhart at approximately 9:30 a.m. on the morning of the murder. Lockhart described the man she saw in the gas station store as wearing a black sweatshirt-type hooded jacket, regular (not baggy) dark pants, and a black nylon-type hat on his head. The nylon hat had a knot tied on the top and the band had some writing on it. The band was pulled over the man's eyes and rested on the lower part of his nose. Bell stated that Lockhart was unsure what kind of shoes he was wearing or whether he was wearing gloves. Lockhart told Bell that the man was dark skinned, possibly black. During cross-examination, Bell stated that Lockhart was very nervous, could not sit still or catch her breath, and was crying.

Lieutenant Richard Weiner testified that he met with Lockhart on the day of the murder and that Lockhart gave him a description of the man she saw inside the gas station store. She told him that the man was "a male, unknown race, approximately 5'6", wearing a dark-hooded sweatshirt and dark pants." Lockhart said the man wore a "do-rag" made of nylon that was pulled over his head. She did not say that the nylon had a knot on the top of it. Based upon her descriptions, Weiner generated a computer composite of the suspected offender. Lockhart told him that the sketch looked like the suspect.

During cross-examination, Weiner stated that because Lockhart was unable to describe any facial features, the sketch was "based upon the computer-generated drawing based upon her description of a—the 5-foot-6 heavy build." Weiner stated that, throughout the process, Lockhart was "quite nervous, agitated, kept wanting to get up, have a cigarette, stand up, sit down, stand up."

Officer Jim Charter, an evidence technician with the Lincolnwood police department, testified that he was assigned to the murder. While canvassing the area, he discovered two bloodstains about one block

away from the gas station. Though he was unable to determine the age of those stains, he stated that whoever left them was walking toward the gas station. He did not find any blood trails leading either to or from the gas station.

Tracey Reppen, a forensic scientist with the Illinois State Police, testified that she tested samples taken from the bloodstains found by Officer Charter, but neither matched Pappas or defendant.

Ron Walczak, a Community Strategies Bureau employee with the Evanston police department, testified that, on April 13, 1998, at approximately 6:23 a.m., while driving to work on Green Bay Road, he saw a nervous-looking man standing on a corner about 50 to 60 yards away from the Citgo gas station. He described the man as black, light to medium complexion, in his early twenties, about 5 feet 7 inches, 150 to 170 pounds, wearing dark clothing, dark pants, and a dark, waist-length jacket.

After closing arguments, the jury found defendant guilty of first degree murder and attempted armed robbery. The jury found that the murder was both (1) accompanied by brutal and heinous behavior, indicative of wanton cruelty, and (2) committed during the commission of the felony of attempted armed robbery.

During the sentencing hearing, the State called Officer Stephan Gershon, who testified as to the facts of defendant's prior conviction for criminal sexual assault, and the victim's sister, Maria Pappas, who read a victim-impact letter. Defendant called his grandmother and first cousin in his behalf. After argument, the circuit court sentenced defendant to a term of natural life imprisonment. Defendant filed a timely notice of appeal.

## ANALYSIS

### I. MOTION TO SUPPRESS

Defendant argues that the circuit court erred when it barred him from calling Lockhart as a witness during his motions to suppress her identification. Defendant does not contest the court's denial of his motions, only the court's refusal to allow him to call "the most pivotal witness to his motion—the actual person who made the identification." Defendant contends that the court's refusal "was particularly prejudicial because the police officers' testimony [during the suppression hearing] was so vague regarding the process through which Lockhart eventually identified" him.

■ There is no question that a defendant has a right to a fair and impartial hearing to determine whether an eyewitness's identification was the product of undue or suggestive police procedures. See *People v. Robinson*, 46 Ill. 2d 229, 231-32, 263 N.E.2d 57 (1970); *People v.*

*Carroll*, 260 Ill. App. 3d 319, 631 N.E.2d 1155 (1992). Because "[h]earings on such motions eliminate collateral issues at trial [citation] and permit defendants to preserve their constitutional rights," a defendant "must be given ample opportunity to support his position and generally should be permitted to call and to examine those witnesses who have information bearing on the matters before the court." *People v. Rosenborgh*, 21 Ill. App. 3d 676, 686, 315 N.E.2d 545 (1974).

Initially, we flatly reject the trial prosecutor's statement that "[g]enerally, the law is that civilians do not testify at motions to suppress identification unless there has been a preliminary showing there is some sort of suggestiveness at the line up procedure." We could find no case, either here in Illinois or elsewhere, that would support such a statement. Moreover, *People v. Strong*, 274 Ill. App. 3d 130, 653 N.E.2d 938 (1995), a case which the prosecutor stated was "exactly on point," is inapposite. Nowhere in *Strong* did this court hold, or even hint, that a civilian cannot or should not testify at a motion to suppress an identification until there is a preliminary showing of suggestiveness. See generally *Strong*, 274 Ill. App. 3d at 137-38. We note that the State has abandoned this argument on appeal.

While no general "civilian testimony" bar exists, there is also no rule that an identifying witness must testify during a defendant's motion to suppress that identification. Such a requirement would not only serve to resurrect the now-defunct "material witness" rule, which mandated that all individuals involved in procuring an allegedly involuntary confession testify during a motion to suppress that confession (see *People v. R.D.*, 155 Ill. 2d 122, 143-44, 613 N.E.2d 706 (1993) (repudiating the material witness rule in its entirety)), but also extend that discarded rule into areas where our supreme court has explicitly refused to go (see *People v. Stokes*, 46 Ill. 2d 325, 327-28, 263 N.E.2d 21 (1970) (refusing to extend the material witness rule to a motion to suppress an allegedly suggestive identification)).

Instead, it is within the sound discretion of the circuit court to determine whether to bar a witness from testifying during a suppression hearing. See *People v. Moore*, 51 Ill. 2d 79, 83, 281 N.E.2d 294 (1972) (finding that the circuit court did not abuse its discretion in denying a request to call the complainant as the court's witness in the hearing on the motion to suppress the identification); *People v. Agee*, 100 Ill. App. 3d 878, 883, 427 N.E.2d 244 (1981) (finding no error in court's refusal to call identifying witness as the court's witness during suppression hearing); but see *People v. Bentley*, 11 Ill. App. 3d 686, 689, 297 N.E.2d 282 (1973) (reversing the defendant's conviction and remanding for a new suppression hearing because the circuit court erred in denying the defendant's motion to suppress after hearing

only one witness (the victim) and refusing to allow the defendant to call other witnesses). Indeed, the circuit court may not only bar a witness from testifying, it may also terminate the hearing in its entirety if "it appears that a pretrial motion is frivolous or imposed for delay." *Rosenborgh*, 21 Ill. App. 3d at 686.

During a motion to suppress an identification, the defendant bears the burden of establishing that, based upon the totality of the circumstances, the pretrial identification was so unnecessarily suggestive that it gave rise to a substantial likelihood of an unreliable identification. *People v. Denton*, 329 Ill. App. 3d 246, 250, 767 N.E.2d 879 (2002), citing *People v. Simpson*, 172 Ill. 2d 117, 140, 665 N.E.2d 1228 (1996). If the defendant meets his burden, the State must then show, by clear and convincing evidence, an independent basis of reliability. *People v. Coleman*, 203 Ill. App. 3d 83, 91, 560 N.E.2d 991 (1990), quoting *People v. Garcia*, 97 Ill. 2d 58, 73, 454 N.E.2d 274 (1983).

The initial burden of suggestiveness being placed squarely upon him, it is clear that a defendant should be permitted to call, as a witness, the person who made the identification in his attempt to suppress that identification. Who better to testify as to the potentially suggestive procedures utilized by the police in procuring an identification than the identifying witness herself?

Allowing the identification witness's testimony during the suppression hearing furthers not only the fairness of the hearing, but also its fullness, presenting the trial court with a complete picture of the police procedures used in procuring an identification through the testimony of both the officers, who employed those procedures, and the identifying witness, who participated in them. See *Robinson*, 46 Ill. 2d at 232 (stating that unless a defendant is afforded a full and fair hearing, it is difficult to make an informed judgment as to whether the identification was influenced by improper proceedings).

That is not to say that the court must always permit a defendant to call the identifying witness(es). There may be situations where it is either impracticable, unnecessary, or otherwise unreasonable for the identifying witness to appear as a witness. Absent a compelling reason, however, the circuit court normally should allow a defendant to call the identifying witness during a suppression hearing. We need not decide here whether the circuit court abused its discretion in barring Lockhart because it was never given a real opportunity to exercise that discretion.

Instead of utilizing the procedures set forth in the Witness Attendance Act, defendant attempted to secure Lockhart's presence by having one of his investigators serve her out of state with a subpoena

that was issued in Illinois. That subpoena, once removed from the boundaries of Illinois, was insufficient to compel Lockhart's presence:

"Generally, a state has no power to subpoena witnesses over which it has no jurisdiction. Thus, the constitutional right of compulsory process, which includes the subpoena of witnesses, is applicable to the states but extends only to in-state process. In the absence of an interstate compact, compulsory process cannot extend beyond the territory of the state, and a state court cannot require the attendance of a witness who is a nonresident of, and is absent from, the state." 81 Am. Jur. 2d *Witnesses* § 15 (2000).

See also *People v. Folenga*, 83 Ill. App. 3d 210, 213, 404 N.E.2d 935 (1980) (finding that the circuit court did not err in setting trial date outside 120-day period because "both of the [State's] witnesses, whose unavailability necessitated delaying the trial, were out-of-State witnesses who could not be subpoenaed by the usual process").

The Witness Attendance Act, adopted in Illinois, is just such an interstate compact. See 725 ILCS 220/3 (West 2000). It "provides a procedure whereby witnesses from without a state can be summoned to testify in criminal cases." 81 Am. Jur. 2d *Witnesses* § 15 (2000). Defendant admitted to the circuit court that he failed to follow the procedures set forth in the Witness Attendance Act. Based upon this admitted failure, we cannot say that the circuit court abused its discretion in denying defendant's request to compel Lockhart's presence at his suppression hearing. See *People v. Burt*, 168 Ill. 2d 49, 71-75, 658 N.E.2d 375 (1995) (finding that the trial court did not abuse its discretion in refusing to compel the presence of out-of-state witnesses due to the defendant's failure to satisfy the requirements of the Witness Attendance Act); see also *People v. Williams*, 252 Ill. App. 3d 704, 718-19, 625 N.E.2d 754 (1993), *rev'd on other grounds*, 165 Ill. 2d 51, 649 N.E.2d 397 (1995) (finding that circuit court did not abuse its discretion in denying the defendant's motion for continuance to locate witnesses because, *inter alia*, the defendant had failed to properly serve them).

Furthermore, Lockhart testified at trial, and defendant does not claim here on appeal that the circuit court unduly limited his cross-examination of her. See *Rosenborgh*, 21 Ill. App. 3d at 686 (holding that the circuit court's decision to allow the defendant to call only one witness at the pretrial hearing "was at most harmless error because all" of the witnesses defendant was barred from presenting testified at trial). Defendant points to nothing in Lockhart's trial testimony that would indicate her identification was the product of suggestive police machinations.

We do note, however, that had defendant properly followed the

procedures in the Witness Attendance Act, the circuit court would have abused its discretion in rejecting defendant's request to call her as a witness. As stated above, her testimony was certainly relevant to the issue of suggestiveness, and her generalized fear of defendant would not have been a sufficient reason to bar her presence during defendant's motion to suppress her identification. Simply offering the defendant an opportunity to reopen his motion to suppress, should Lockhart's trial testimony warrant it, would not have cured the error.

In sum, while it is preferable that the identifying witness testify during a defendant's motion to suppress that witness's identification, because defendant failed to properly employ the procedures set forth in the Witness Attendance Act, the circuit court did not abuse its discretion in denying defendant's request to compel Lockhart's presence at his suppression hearing.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the evidence at trial was insufficient to sustain his convictions for first degree murder and attempted armed robbery. Specifically, defendant contends that Lockhart's identification was unreliable and that Fomond's accomplice testimony did not carry an "absolute conviction of its truth."

When we review a challenge to the sufficiency of the evidence at trial, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Morgan*, 306 Ill. App. 3d 616, 632, 713 N.E.2d 1203 (1999). A reviewing court should apply this standard regardless of whether the evidence is direct or circumstantial and should not substitute its judgment for that of the finder of fact on questions involving the weight of the evidence or the credibility of witnesses. *People v. Sutherland*, 155 Ill. 2d 1, 17, 610 N.E.2d 1 (1992).

### A. Lockhart's Identification

■ Defendant contends that Lockhart's identification was unreliable because (1) she did not have a sufficient opportunity to view the man in the gas station, (2) she failed to identify defendant in the April 22, 1998, lineup conducted nine days after the murder, (3) the computer-generated sketch did not resemble defendant, and (4) her subsequent identification of defendant occurred two years after the crime and was the result of suggestive police procedures.

An identification will not be deemed sufficient to support a conviction if it is vague or doubtful. *People v. Rodriguez*, 312 Ill. App. 3d 920, 933, 728 N.E.2d 695 (2000). In evaluating the reliability of an identification, Illinois has ascribed to the *Neil* factors, which include

(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08, 537 N.E.2d 317 (1989), citing *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972).

Though it may appear that at least four out of the five *Neil* factors weigh against finding Lockhart's identification reliable, *i.e.*, (1) she had only a few seconds to observe the suspect; (3) she did not give a detailed description of the suspect and vouched for a computer-generated sketch that looked nothing like defendant; (4) she did not identify defendant during the April 22, 1998, lineup; and (5) she identified defendant two years after the murder, it is clear from the record that these deficiencies were due not to Lockhart's inability to adequately observe the offender but, rather, to her being a recalcitrant witness who refused to cooperate with police in the investigation.

Each officer who dealt with Lockhart during the course of the investigation testified to her agitated emotional state, using such terms as "nervous," "convulsing," "violently shaking," "crying," and "sobbing" to describe her demeanor. Lockhart herself testified that she did not cooperate in the investigation because she feared for her safety and the safety of her family. See *People v. Evans*, 80 Ill. App. 3d 444, 452, 399 N.E.2d 1333 (1979) (stating that a "delay in making an identification out of fear has been held to only affect the weight of the witness' identification"). Lockhart testified that her failure to pick defendant out of the April 22, 1998, lineup was not out of an inability to do so but, rather, out of the fear, justified or not, of what might happen to her if she did. It is not that she *could not*, it is that she *would not* identify defendant.

Moreover, Lockhart testified that she knew, or at least knew of, and had previously seen defendant. She testified that, even though he was wearing a nylon over his face, she recognized him as someone she had occasionally seen on the streets of Evanston. See *People v. Zarate*, 264 Ill. App. 3d 667, 674, 637 N.E.2d 1044 (1994) (stating that a prior acquaintance with the accused strengthens a witness's identification testimony). Thus, despite the discrepancies between her less-than-forthright description of the suspect and defendant, as well as the two-year delay between the murder and her eventual identification, a rational group of 12 jurors could have found her identification reliable.

### B. Fomond's Accomplice Testimony

Defendant argues that Fomond's testimony was unreliable

because (1) he had a motive to testify falsely due to his deal with the State, (2) Fomond repeatedly lied to the police as to his and defendant's involvement in the attempted armed robbery and murder, and (3) his testimony was uncorroborated.

Though the testimony of an accomplice has "inherent weaknesses" (*People v. Brown*, 185 Ill. 2d 229, 247, 705 N.E.2d 809 (1998)), our supreme court has long recognized that uncorroborated accomplice testimony can establish a satisfactory basis for conviction because it "goes to the weight of the evidence and is, therefore, in the province of the jury or court" (*People v. Wilson*, 66 Ill. 2d 346, 349, 362 N.E.2d 291 (1977)).

Here, the jury was well aware of Fomond's "deal" with the State, as well as the "stories" Fomond had told the police before finally coming clean. We note that these "stories" did not relate to his and defendant's plan to rob the gas station; once he confessed to his and defendant's involvement, he did not waver from the details of that confession. Moreover, the jury was properly instructed, via Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992) (hereinafter IPI Criminal 3d), that it was to carefully examine Fomond's testimony with "suspicion" and "caution." Finally, Fomond's testimony was at least partially corroborated by Tillman's testimony in both the manner of dress defendant said he would wear during the robbery and the fact that defendant was within a few blocks of the gas station just before the attempted armed robbery and murder occurred. Because a rational jury could have found Fomond's testimony reliable, there was sufficient evidence to support defendant's convictions for first degree murder and attempted armed robbery.

### III. PRIOR CONSISTENT STATEMENT

Defendant next argues that the circuit court erred in allowing the State to use Fomond's prior consistent statement as substantive evidence. Defendant does not argue that there was no basis to admit the statement; only that the State used Fomond's statement as substantive evidence because it was allowed to read it in its entirety to the jury, enter it into evidence, and send it back with the jury during its deliberations.

The State counters that defendant waived this argument by failing to make a specific objection, the statement was properly used for rehabilitative purposes only, and, even if it was erroneously used as substantive evidence, because the jury was "specifically instructed to consider Fomond's prior consistent statement for a limited purpose" and because the evidence of defendant's guilt was overwhelming, defendant was not prejudiced.

A witness's prior consistent statement is admissible only to rebut a charge or inference that he was motivated to lie or that his testimony was of recent fabrication, so long as he made the prior statement before either the motive arose or the alleged fabrication was made. See *People v. Lambert*, 288 Ill. App. 3d 450, 453, 681 N.E.2d 675 (1997). Here, as noted above, defendant does not argue that the circuit court erred in allowing evidence of Fomond's prior consistent statement. He instead argues that the State placed too much emphasis on it, thereby violating the common-law rule, followed in Illinois, that "where admission is allowed, a prior consistent statement is permitted solely for rehabilitative purposes and not as substantive evidence." *Lambert*, 288 Ill. App. 3d at 457.

Initially, we note that "the common-law rule has been changed in most jurisdictions that have adopted the Federal Rules of Evidence." *Lambert*, 288 Ill. App. 3d at 459. Specifically, Federal Rule of Evidence 801(d)(1)(B) excludes such statements from the definition of hearsay. See Fed. R. Evid. 801(d)(1)(B). According to the advisory committee notes for that rule, the divergence from the common law was driven both out of reasons of fairness, for "once the opponent has opened the door by attacking the witness's credibility, it is not unfair to permit the party to bolster its witness by presenting additional consistent evidence," and the practical belief that " 'the jury in all probability would misunderstand or ignore a limiting instruction anyway, so there is no good reason for giving one.' " *Lambert*, 288 Ill. App. 3d at 459-60, quoting J. Weinstein, Evidence, U.S. Rules, at 801—187, 801—188 (1996); see also *Lambert*, 288 Ill. App. 3d at 464 (Doyle, J., dissenting) ("In my view, the debate over characterizing the statements as either substantive or rehabilitative, in the context of the present facts, is merely a lexical tempest in a legal teapot having little or no practical bearing on the outcome of the trial"). According to both the advisory committee and Justice Doyle, merely labeling a prior consistent statement as "For Rehabilitative Purposes Only" offers little to no guidance to jurors.

However, our supreme court recently discussed the common-law rule limiting the use of a witness's prior consistent statement and did not signal any desire to deviate from it. See *People v. Walker*, 211 Ill. 2d 317, 343-46, 812 N.E.2d 339 (2004). Thus, we continue to adhere to it.

■ Even if, *arguendo*, the State's use of Fomond's prior statement did violate that rule, defendant has waived this issue. First, defendant never specifically objected that the State was improperly using that statement as substantive evidence. See *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005) (stating that a "specific objection waives all other

unspecified grounds"). Second, not only did defense counsel utilize the prior statement during his cross-examination of Fomond, defendant never requested that the jury be given a limiting instruction. See *People v. Edwards*, 144 Ill. 2d 108, 168-69, 579 N.E.2d 336 (1991) (stating that when evidence is competent only for one purpose, the other party is entitled by instructions to have it limited to the purpose for which it is proper; but if the opponent of the evidence fails to ask for an instruction confining the evidence to its legitimate sphere, he is deemed to have waived any objection he may have). Thus, defendant has waived his challenge to the State's use of Fomond's prior consistent statement. See *Walker*, 211 Ill. 2d at 345 (stating that the "defendant's failure to raise appropriate objections or to submit limiting instructions might present procedural barriers to a reversal of [the] defendant's convictions" based upon the improper use of a prior consistent statement as substantive evidence); *People v. Curtis*, 354 Ill. App. 3d 312, 323-24 (2004) (finding the defendant had waived his argument that a prior consistent statement was improperly admitted).

Defendant relies upon *People v. Walker*, 335 Ill. App. 3d 102, 779 N.E.2d 268 (2002), *aff'd*, 211 Ill. 2d 317, 812 N.E.2d 339 (2004), and *People v. Lambert*, 288 Ill. App. 3d 450, 681 N.E.2d 675, to support his argument that the State improperly used Fomond's statement as substantive evidence. In those cases, however, there was no question that the prior consistent statement was used as substantive evidence. See *Walker*, 211 Ill. 2d at 345 (where prosecutor told trial court that it could admit prior consistent statement as substantive evidence and argued to the jury that the statement "tells the truth"); *Lambert*, 288 Ill. App. 3d at 453 (despite the trial court's warning that he " 'may be putting reversible error' into the case," the prosecutor offered prior consistent statement as substantive evidence).

Here, the prosecutor explicitly stated, during the jury instruction conference, that she was not introducing the statement "as substantive evidence." While this statement was not made in the presence of the jury, it supports the State's argument that it did not intend to utilize Fomond's prior consistent statement in contravention of the common-law rule. That being said, in determining whether a prior consistent statement was properly utilized, the focus should be upon its potential effect on a jury, and not the expressly stated intent of the prosecutor offering the statement.

Under the common-law rule, a prior consistent statement may only serve to rebut the defense argument that either the witness's testimony was a recent fabrication or the witness had a "motive to testify falsely." By allowing the State to inform the jury of the witness's prior consistent statement, made prior to the alleged fabrica-

tion or before the alleged motive arose, the State can diffuse that argument. The State cannot argue, however, that what the witness is saying at trial is true because "he said it before." According to this rule, " 'mere repetition does not imply veracity.' " *Lambert*, 288 Ill. App. 3d at 458, quoting *Coltrane v. United States*, 418 F.2d 1131, 1140 (D.C. 1969). Thus, the prior consistent statement can only dissipate the "recent lie" or "motive to testify falsely" cloud that the defense counsel has placed over the witness's head during cross-examination.

In this case, due to the importance of Fomond's testimony to the State's case and the emphasis the State placed upon his prior statement, not only in reading it verbatim to the jury, but then sending it back to the jury without any limiting instruction, there was a risk here that the jury could have improperly relied upon it as substantive evidence, believing that because Fomond implicated defendant before, he must have been telling the truth on the witness stand. This risk is heightened where, despite the State's contention to the contrary, there was no limiting instruction concerning how the jury was to consider Fomond's prior consistent statement (IPI Criminal 3d No. 3.11, which concerns prior *inconsistent* statements, was given).

Therefore, because Illinois continues to adhere to the common-law rule limiting the use of a witness's prior consistent statement for rehabilitative purposes only, we recommend that the following instruction be given when the State seeks to admit such a statement:

> "Members of the Jury, the prior statement of [witness's name] has been admitted for the limited purpose of rebutting a charge that (1) [his/her] [testimony is a recent fabrication] or (2) [he/she] [had a motive to testify falsely]. It may be considered only as it may or may not bear upon the believability of [witness's name]. It cannot be considered by you as independent proof that the defendant committed the crime alleged."

A similarly worded instruction was reviewed with approval in *People v. Antczak*, 251 Ill. App. 3d 709, 719, 622 N.E.2d 818 (1993). Such an instruction would inform the jurors both as to why the prior statement was admitted and how they should consider it, without including potentially confusing "legalese" such as "rehabilitate" and "substantive." Moreover, use of this instruction also avoids the herculean task of trying to demarcate where "rehabilitative use" ends and "substantive use" begins.

## IV. IDENTIFICATION INSTRUCTION

■ Defendant next argues that, under *People v. Gonzalez*, 326 Ill. App. 3d 629, 761 N.E.2d 198 (2001), the circuit court improperly modified IPI Criminal 3d No. 3.15 by placing the word "or" in between each factor the jury could consider when determining the reliability of

Lockhart's identification. We, however, adhere to this court's decision in *People v. Tisley*, 341 Ill. App. 3d 741, 749, 793 N.E.2d 181 (2003), which found that "giving IPI Criminal 3d No. 3.15 with disjunctive language was not error." Moreover, by failing to object to this instruction during the jury instructions conference or including this issue in his posttrial motions, defendant has waived this issue.

Defendant urges this court to consider the issue as plain error. Under a plain error analysis, he bears the burden of proving that the error was prejudicial. See *People v. Crespo*, 203 Ill. 2d 335, 347-48, 788 N.E.2d 1117 (2003). While Lockhart's identification testimony was certainly important to the State's case, we cannot say, based upon the other evidence at trial, including Fomond's testimony concerning his and defendant's plans to carry out an armed robbery of the gas station store, as well as Tillman's testimony placing defendant within a few blocks of the gas station just before the murder occurred, that defendant has shown that he was prejudiced by including "or" in the instruction given. See *Tisley*, 341 Ill. App. 3d at 747; *People v. Furdge*, 332 Ill. App. 3d 1019, 1031-32, 774 N.E.2d 415 (2002); *People v. Mercado*, 333 Ill. App. 3d 994, 1000, 777 N.E.2d 641 (2002). We note that the IPI Committee amended IPI Criminal 4th No. 3.15 in 2003, directing trial courts to "not use 'or' or 'and' between the factors where more than one factor is used." IPI Criminal, No. 3.15, Committee Note at 2 (4th ed. Supp. 2003).

## V. PROSECUTORIAL MISCONDUCT

■ Defendant next argues that the prosecution elicited inflammatory testimony and made numerous improper remarks during its closing and rebuttal arguments. Specifically, defendant contends that the prosecutor (1) told the jury, without any evidentiary basis, that both Lockhart and Fomond were afraid of defendant; (2) elicited "irrelevant, prejudicial, and inflammatory testimony about" the victim from his sister and godfather; and (3) argued facts that were not based upon evidence presented at trial or reasonable inferences therefrom.

Initially, of the 26 comments that defendant complains of here, only one comment was objected to (a comment concerning theoretical dialogue between defendant and the victim). Therefore, defendant has waived his argument as to the 25 unobjected-to comments.

Waiver aside, we reject defendant's argument that the testimony and comments were either improper or prejudicial. Prosecutors are permitted a great deal of latitude in closing and rebuttal argument. See *People v. Evans*, 209 Ill. 2d 194, 225, 808 N.E.2d 939 (2004). Complained-of statements must be construed based upon the arguments as a whole, and counsel can comment on the defense counsel's

characterization of the evidence or case. *Evans*, 209 Ill. 2d at 225. While a prosecutor may not make arguments or assumptions that have no basis in evidence, even improper comments or remarks are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the accused. *People v. Robinson*, 157 Ill. 2d 68, 84, 623 N.E.2d 352 (1993).

### A. Witness's Fear of Defendant

Defendant contends that the State "improperly suggested to the jury that Dawn Lockhart failed to identify [him] at a line-up and for two years after the offense because she was afraid of [him]." Defendant's argument to the contrary notwithstanding, it is certainly a reasonable inference from Lockhart's testimony that the reason she did not identify defendant until two years after the murder was out of a fear for her and her family's safety. When asked why she did not cooperate with the investigation, she stated, "I was tired of them coming, asking me questions. I have a family. I have to live there. I was tired of it. I wanted it over with." While Lockhart did not explicitly state that she feared defendant, the State's argument was appropriately based upon a reasonable inference from her testimony at trial. Notably, the State never argued or insinuated that defendant had ever actually threatened her.

Moreover, Fomond's testimony that he was currently living in the witness protection program of the Cook County jail was not prejudicial. The State did not delve into why he was in the witness protection program. The statement was merely his response to a question about where he was currently living. Moreover, there was no indication, inference, or insinuation that it was fear of defendant which put him there nor was there any discussion that placement in the witness protection program was part of the deal he worked out with the State in exchange for his testimony. Even if this statement was error, it was harmless.

### B. Palm Sunday Testimony and Life Photo

Defendant next argues that the State elicited improper and irrelevant background information about the victim. Specifically, defendant complains that the testimony of the victim's sister and godfather concerning the fact that the murder occurred on the Monday following Palm Sunday, as well as the life photo of the victim in his military uniform, was both inflammatory and prejudicial.

The "Palm Sunday" testimony explained to the jury why the victim was in Evanston that weekend and why he agreed to open up the gas station on that Monday morning, something that Fomond testified was normally done by the gas station owner. Furthermore,

though the life photo depicts the victim in his military uniform, as the State points out, it did not mention his military background or service at any point during the trial. Defendant has not shown how this testimony or photo was unduly prejudicial.

The testimony and evidence defendant complains of here do not approach the clearly inflammatory testimony elicited in the cases he relies upon to support his argument (see *People v. Hope*, 116 Ill. 2d 265, 276-78, 508 N.E.2d 202 (1986) (finding repeated references to victim's wife and small children improper); *People v. Blue*, 189 Ill. 2d 99, 131, 724 N.E.2d 920 (2000) (testimony concerning age of victim's child, fact that family had lived in same building together, and length of time victim's father had been married served no other purpose than to inflame jury)).

### C. Facts Not in Evidence

Defendant next argues that the prosecutor "recited details of the offense which were not included in the evidence." Specifically, defendant contends that the prosecutor improperly (1) concocted an imaginary dialogue between defendant and the victim, (2) told the jury that defendant beat the victim with a fire extinguisher, and (3) argued that the victim struggled "to remain alive during the course of the offense." All of the statements defendant complains of, however, are based upon reasonable inferences from evidence admitted at trial.

Defendant cites no case that holds that a prosecutor cannot speculate as to what was said between a victim and his assailant during the commission of a crime. Moreover, the physical evidence in the gas station store demonstrates that there was a violent struggle between the victim and his assailant, *i.e.*, the "bashed-in" bathroom door, the disarray of the cashier's area, etc. The evidence also established that the victim's blood was on the fire extinguisher and that the victim had suffered numerous blunt trauma injuries to his head, chest, and back. Based upon this evidence, the prosecutor could reasonably argue that the fire extinguisher was used to inflict those injuries.

Finally, the fact that the victim suffered numerous blunt trauma injuries on his front, head, and back, plus a gunshot wound to the back, indicates that the victim did not sit idly by during the attack. Thus, the State's comments that Pappas struggled to remain alive during the course of the robbery were properly based upon reasonable inferences from the evidence.

### VI. FAILURE TO INSTRUCT ON "WANTON CRUELTY"

■ Normally, the maximum sentence for first degree murder is 60 years. 730 ILCS 5/5—8—1(a)(1)(a) (West 2000); *People v. Swift*, 202

Ill. 2d 378, 392, 781 N.E.2d 292 (2002). If, however, the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, the circuit court may impose an enhanced sentence of 60 to 100 years (730 ILCS 5/5—8—2(a) (West 2000)), or natural life imprisonment (730 ILCS 5/5—8—1(a)(1)(b) (West 2000)). After the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), any factual finding which increases a defendant's sentence beyond the maximum permitted under the statute, such as a finding that the crime was accompanied by exceptionally brutal or heinous conduct, indicative of wanton cruelty, must be proven to a jury beyond a reasonable doubt. *Swift*, 202 Ill. 2d at 392. In response to *Apprendi*, our legislature amended section 5—8—1(a)(1)(b) of the Unified Code of Corrections to provide that a defendant convicted of first degree murder may receive an enhanced sentence of natural life in prison " 'if a trier of fact finds beyond a reasonable doubt that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.' " *People v. Jett*, 341 Ill. App. 3d 200, 202, 793 N.E.2d 214 (2003), quoting 730 ILCS 5/5—8—1(a)(1)(b) (West 2000).

In accordance with *Apprendi, Swift*, and the amended section 5—8—1(a)(1)(b), the jury in this case was provided with a special interrogatory, that stated:

> "[I]f you have found the defendant guilty of the offense of first degree murder, you *must* then decide whether or not the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Emphasis added.)

The jury was then instructed as to the definitions of both "brutal" and "heinous," but not "wanton cruelty." Defendant argues that the circuit court erred when it failed to instruct the jury as to the definition of "wanton cruelty" and, thus, he should receive a new sentencing hearing.

Initially, we note that courts have approved the use of special interrogatories to determine whether aggravating factors warranting an extended sentence were proven beyond a reasonable doubt. In *People v. O'Quinn*, 339 Ill. App. 3d 347, 359-61, 791 N.E.2d 1066 (2003), the court found that the use of a special interrogatory to determine the victim's age did not violate the defendant's right to due process.

In *People v. Jett*, 341 Ill. App. 3d 200, 203, 793 N.E.2d 214 (2003), the court approved a special interrogatory that submitted to the jury the question of whether the murder was committed by brutal or heinous behavior, indicative of wanton cruelty. Noting that the terms "brutal," "heinous," and "wanton cruelty" were not elements of first

degree murder, even where the State included them in the indictment, the court reasoned that "[i]n submitting the determination of this factor to the jury, the State followed the Supreme Court's directive in *Apprendi*. There was no prejudice whatsoever to defendant's constitutional rights." *Jett*, 341 Ill. App. 3d at 203.

Likewise, in *People v. Forcum*, 344 Ill. App. 3d 427, 435, 800 N.E.2d 499 (2003), the court approved the use of the following special interrogatory: " 'Has the State proven beyond a reasonable doubt that the offense was committed by exceptionally brutal or heinous behavior indicative of wanton cruelty?' "

In neither *Jett* nor *Forcum* was there any indication that the jury was instructed as to the definition of "brutal," "heinous," or "wanton cruelty." Nor was there any indication that the failure to include such definitions was error. Moreover, there are no IPI instructions defining "brutal," "heinous," or "wanton cruelty," nor is there any case requiring that the jury be instructed as to the definitions of each of those terms when the defendant is charged with that aggravating factor.

However, in *People v. Nielson*, 187 Ill. 2d 271, 299, 718 N.E.2d 131 (1999), our supreme court noted the definition for each of these terms. The court also noted that the jury must find beyond a reasonable doubt that the defendant acted with wanton cruelty in order for the circuit court to impose the extended term of life imprisonment. See *Nielson*, 187 Ill. 2d at 299 (stating that to "justify an extended-term sentence," a defendant must not only have acted brutally or heinously, but "also must have demonstrated wanton cruelty").

In light of *Nielson*, and the fact that the circuit court here instructed the jury that, if it finds that defendant committed first degree murder, it then *must* determine whether the murder in this case "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty," and then instructed the jury as to the definitions of both "brutal" and "heinous," we find that the circuit court should have instructed the jury as to the definition of "wanton cruelty."

However, because defendant failed to object to this definitional omission, tender a remedial instruction, or include this issue in his posttrial motion, under a plain error analysis, he must prove prejudice. See *People v. Hopp*, 209 Ill. 2d 1, 8, 805 N.E.2d 1190 (2004) (stating that "the erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial"). We find that there was no serious risk that the jurors incorrectly found the existence of the aggravating factor of exception-

ally brutal or heinous behavior, indicative of wanton cruelty. Consequently, we hold that it was not plain error for the circuit court to have failed to instruct the jury as to the definition of "wanton cruelty" where there was no IPI instruction defining that term, no case mandating that the jury be instructed as to its definition, and the defendant did not ask that the jury be so instructed.

Furthermore, as explained below in Part VII (see 356 Ill. App. 3d at 98), there was overwhelming evidence in this case that Pappas' murder was accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty. Thus, the circuit court's failure to instruct the jury as to the definition of wanton cruelty was not plain error.

## VII. SUFFICIENCY OF EVIDENCE OF BRUTAL OR HEINOUS BEHAVIOR, INDICATIVE OF WANTON CRUELTY

Defendant next argues that because there was no evidence "of prolonged pain, torture, or premeditation," the State failed to prove beyond a reasonable doubt that the murder was accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty.

"Brutal" behavior is behavior that is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded. *Nielson*, 187 Ill. 2d at 299. "Heinous" behavior is behavior that is hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal. *Nielson*, 187 Ill. 2d at 299. Finally, "wanton cruelty" requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense. *Nielson*, 187 Ill. 2d at 299.

When assessing the brutality and heinousness of a crime, the trier of fact must evaluate all of the facts surrounding the offense. *People v. Hartzol*, 222 Ill. App. 3d 631, 651, 584 N.E.2d 291 (1991). Various factors indicative of such behavior include *Hartzol* premeditation, the unprovoked nature of the attack, the "senseless" nature of the act, the number of wounds inflicted, the danger created by the act, and the extent of the injury inflicted. *Hartzol*, 222 Ill. App. 3d at 652.

■ Here, during the course of an attempted armed robbery, defendant beat Pappas extensively about the back, chest, and head with a fire extinguisher. There was no evidence to suggest that defendant either knew Pappas or was provoked by him during the attempted robbery. Contemporaneously with this beating, defendant shot Pappas in the back. Utilizing the factors listed in *Harzol*, a rational trier of fact could have found that Pappas' murder was accompanied by exceptionally brutal or heinous behavior, indicative of wanton cruelty.

Defendant, relying on *People v. Lucas*, 132 Ill. 2d 399, 445-46, 548 N.E.2d 1003 (1989), argues that the State failed to meet its burden

because there was no evidence of "prolonged pain, torture, or premeditation." Despite defendant's contention, such evidence is not necessary for a murder to be considered brutal or heinous, indicative of wanton cruelty. In the passage that defendant relies upon in *Lucas*, the supreme court merely noted that "[c]ases in which this court has found brutal or heinous behavior to be present have *generally* involved prolonged pain, torture or premeditation." (Emphasis added.) *Lucas*, 132 Ill. 2d at 445. *Generally*, of course, does not mean *always*. Thus, while evidence of prolonged pain, torture, or premeditation might support a finding of brutal or heinous behavior, such evidence is not a *sine qua non* for a defendant to qualify for the brutal and heinous sentence extender.

Furthermore, in *Lucas*, the supreme court found that the murder of a seven-month-old by his intoxicated father did not qualify as brutal and heinous because (1) the victim's death resulted from suffocation and occurred almost immediately after the defendant inflicted his injuries and (2) there was evidence indicating that the injuries could have been inflicted by a single blow and that no conclusive evidence indicated the victim's death was premeditated, prolonged, or torturous. See *People v. Lewis*, 334 Ill. App. 3d 993, 1007-08, 779 N.E.2d 490 (2002), citing *Lucas*, 132 Ill. 2d at 446. Here, Pappas was severely beaten and shot in the back; his death was the result of a premeditated armed robbery that went awry. Defendant's reliance upon *Lucas* is unpersuasive.

## VIII. EXCESSIVE SENTENCE

Defendant finally argues that the circuit court abused its discretion in sentencing him to life imprisonment by failing to consider the mitigating evidence presented in his behalf. Though the circuit court did not recite the mitigating evidence, it is presumed that the court considered it. See *People v. Zarka-Nevling*, 308 Ill. App. 3d 516, 526, 720 N.E.2d 334 (1999) (stating that where mitigating factors are present, the appellate court presumes the trial court considered them). Moreover, mitigating factors are not entitled to more weight than the seriousness of the offense. *People v. Pippen*, 324 Ill. App. 3d 649, 652, 756 N.E.2d 474 (2001).

During sentencing, the circuit court noted:

"The Jury found that this case was brutal and heinous, indicative of wanton cruelty. The armed robbery, the forcible felony of attempt armed [robbery], rather, it was committed during the course of the murder. You are eligible for an extended term. You are eligible for natural life and that's what I'm sentencing you to."

In the instant case, the circuit court had two separate bases to impose a sentence of natural life: (1) a finding that the murder was

committed in a brutal or heinous manner indicative of wanton cruelty, and (2) the murder was committed during the course of a felony. See *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002) ("We observe that when any statutory enhancing aggravating factor is proved to exist beyond a reasonable doubt[,] *** the original sentencing range increases according to the statutory scheme"); see also 730 ILCS 5/5—5—3.2(b)(2) (West 2000) (the court may impose an extended-term sentence under section 5—8—2 upon any offender where "a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty"); 730 ILCS 5/5—8—1(a)(1)(b) (West 2000) (stating that the circuit court may impose a natural life sentence if the trier of fact determines beyond a reasonable doubt that the murder was either accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or any of the aggravating factors listed in section 9—1(b) (720 ILCS 5/9—1(b) (West 2000)) are present). Moreover, the imposed sentence was within the statutory range. We find that the circuit court did not abuse its discretion in imposing a sentence of natural life.

Affirmed.

GREIMAN, J., concurs.

JUSTICE THEIS, specially concurring:

I concur with the result reached by the majority in this case, but because I disagree with its analysis on three issues, I specially concur.

First, I disagree with the majority's treatment of defendant's argument concerning the witness identification jury instruction. In that discussion, the majority cites to only one case to support its holding that the version of IPI Criminal 3d No. 3.15 used in this case was not erroneous and, in doing so, ignores a wealth of contrary authority. This court has repeatedly held that the use of the word "or" in between each of the five factors the jury could consider when determining the reliability of a witness' identification in IPI Criminal 3d No. 3.15 was error. See *People v. Briones*, 352 Ill. App. 3d 913, 920, 816 N.E.2d 1120, 1126 (2004); *People v. Carrero*, 345 Ill. App. 3d 1, 11, 801 N.E.2d 1084, 1093 (2003); *People v. Smith*, 341 Ill. App. 3d 530, 546, 794 N.E.2d 367, 383 (2003); *People v. Saraceno*, 341 Ill. App. 3d 108, 113-16, 791 N.E.2d 1239, 1243-46 (2003); *People v. Brookins*, 333 Ill. App. 3d 1076, 1083, 777 N.E.2d 676, 682 (2002); *People v. Mercado*, 333 Ill. App. 3d 994, 999-1000, 777 N.E.2d 641, 645-46 (2002); *People v. Furdge*, 332 Ill. App. 3d 1019, 1032, 774 N.E.2d 415, 426 (2002);

*People v. Gonzalez*, 326 Ill. App. 3d 629, 639-41, 761 N.E.2d 198, 207-08 (2001). See also *People v. Waters*, 328 Ill. App. 3d 117, 130-31, 764 N.E.2d 1194, 1205 (2002).[1] Despite the fact that defendant cites many of these cases in his brief, the majority fails to distinguish, or even acknowledge, them. While *Tisley* disagrees with these cases and holds that the giving of IPI Criminal 3d No. 3.15 with disjunctive language was not erroneous, no case has followed this holding in *Tisley* and, in fact, this holding has been criticized and rejected by one panel of this court in *Carrero*. *Carrero*, 345 Ill. App. 3d at 11, 801 N.E.2d at 1092-93.

Additionally, I note that the Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases amended this jury instruction in 2003 and removed the bracketed word "or" between the factors. The Committee Note now instructs trial courts not to use "or" or "and" between the factors where more than one factor is used. Illinois Pattern Jury Instructions, Criminal, No. 3.15, Committee Note (4th ed. Supp. 2003).

I agree with *Gonzalez* and its progeny and would hold that the use of IPI Criminal 3d No. 3.15 with the bracketed word "or" in this case constituted error. However, I agree with the majority that defendant waived this issue by not objecting to this instruction or including this issue in his posttrial motion. Although the law is unsettled as to which plain error test is appropriate in this situation (see 177 Ill. 2d R. 451(c) (addressing when "substantial defects" in jury instructions can be addressed despite waiver); *People v. Carter*, 213 Ill. 2d 295, 299, 821 N.E.2d 233, 236 (2004) (finding that the plain error doctrine allows a reviewing court to address defects affecting substantial rights if the evidence is closely balanced or if fundamental fairness so requires); *Crespo*, 203 Ill. 2d at 348, 788 N.E.2d at 1124 (applying the federal plain error test)), I would find that based on the evidence presented in this case, this error does not rise to the level of plain error under any of these tests. Thus, although I would find that the jury instruction given was erroneous, I agree with the majority that the issue is waived.

Additionally, I must comment on defendant's argument that the State improperly used Fomond's prior consistent statement as substantive evidence. During the jury instruction conference, the assistant State's Attorney assured the trial court that she was not introducing the statement "as substantive evidence." However, she in fact did use this statement substantively when she admitted the statement into

---

[1]This issue is currently pending in the Illinois Supreme Court. *People v. Herron*, No. 1—01—3889 (November 7, 2002) (unpublished under Supreme Court Rule 23), *appeal allowed*, 207 Ill. 2d 617 (2004).

evidence, gave it to the jury during its deliberations, and argued the truth of that statement during closing arguments. Additionally at the jury instruction conference, the prosecutor tendered IPI Criminal 3d No. 3.11, which, she indicated, would explain to the jury not to use this statement substantively. However, IPI Criminal 3d No. 3.11 concerns the use of prior *inconsistent* statements and makes no mention of prior *consistent* statements. IPI Criminal 3d No. 3.11. In fact, the instruction is entitled "Prior Inconsistent Statements" and the Committee Note clearly states that this instruction should be used when the jury heard earlier inconsistent statements. IPI Criminal 3d No. 3.11 Committee Note. Thus, this instruction was inappropriate here where the issue concerned solely Fomond's prior consistent statement.

However, despite the fact that the State offered, and the trial court gave, the incorrect jury instruction, I find this issue to be waived where defense counsel did not offer his own jury instruction and in fact, agreed with the State to tender IPI Criminal 3d No. 3.11.

Additionally, I must address one comment made by the prosecutor in closing arguments. The majority never specifically addresses this comment, finding that nearly all alleged improper comments were waived when defendant failed to object to them. The majority also finds that all of the complained-of comments were not improper. However, because I find that this comment was blatantly improper, I must mention it here.

In closing argument, while addressing the fact that Lockhart failed to identify defendant until two years after the murder, the prosecutor argued:

> "[Lockhart] walked in[to the gas station], and she saw somebody she knew, that man right there (indicating) Antoine Smith, somebody she knew from the Evanston area. *And she knew that he knew her as well.*
>
> So, *we are not talking about a one-way identification here.* She told you their eyes met. They looked straight at each other.
> * * *
> But she was so overwrought with fear. The best she could do is give [the police] some statements, some description, something, because she knew that she knew the offender in this case, and *she knew he knew her as well.*
> * * *
> She looked at Antoine, and she recognized him, and *he recognized her* and she ran out." (Emphasis added.)

These comments were improper because they are clearly not based upon the evidence in this case. *People v. Johnson*, 208 Ill. 2d 53, 115,

803 N.E.2d 405, 440 (2003). With respect to this subject, Lockhart testified solely that she looked at defendant and he looked at her. While she recognized him, Lockhart never testified that defendant recognized her or that he knew her. Because these comments were not based on the evidence, I disagree with the majority and would find they were improper. However, I ultimately agree with the majority that such comments were waived.

Accordingly, I concur with the result of the majority in affirming this case.